# EXHIBIT A

# DUBLIN TOWN & COUNTRY
## SHOPPING CENTER
## LEASE AGREEMENT

Space No. __7272__

In consideration of the rents and covenants hereinafter set forth, Landlord hereby leases to Tenant, and Tenant hereby rents from Landlord, the following described Leased Premises on the terms and conditions set forth in this Shopping Center Lease Agreement, hereinafter referred to as "Lease".

## FUNDAMENTAL LEASE PROVISIONS

Date of Lease: __April 3, 1985__

Shopping Center: The real property depicted on the plot plan attached hereto as Exhibit "B", located in the City of __Dublin__, County of __Alameda__, State of __California__, all as more fully described in Exhibit "A" hereto. **(§1)**

Leased Premises: The area generally outlined in red on the plot plan attached hereto as Exhibit "B", containing the following approximate Leased Area: __1806__ sq. ft., which Leased Area (if known as the date of this Lease) is commonly designated as __(BuildingA) 7272 San Ramon Road__ . **(§1)**
Street Address

Landlord: __DUBLIN TOWN & COUNTRY ASSOCIATES__

Tenant: ~~CARLTON L. PERRY and DWIGHT W. PERRY, individuals~~
__CROW CANYON DRY CLEANERS – A GENERAL PARTNERSHIP__

Lease Term: __ten__ ( 10 ) lease years (See Addendum) **(§3)**

Rent Commencement Date: ( 60 ) days subsequent to Date of Possession, or when open for business, whichever occurs first. **(§3)**

Fixed Minimum Annual Rent: $ __27,090.00__         Fixed Minimum Monthly Rent: $ __2,257.50__ **(§4.A.)**

Percentage Rent: __N/A__ percent ( N/A %) per month of Tenant's gross sales. **(§4.B.)**

Security Deposit: __Three Thousand Four Hundred__ ($ __3,400.00__ ) **(§12)**

Use of Leased Premises __Dry cleaning plant, rental of carpet cleaning equipment and laundry and shoe repair agency businesses.__ **(§11)**

Tenant's Trade Name: __Crow Canyon Cleaners__ **(§11)**

Address for Notices:
Landlord — __1460 Maria Lane, Suite 420__     Tenant — __Carl Perry__ **(§30.F.)**
__Walnut Creek, CA 94596__     __2462 San Ramon Valley Blvd.__
     __San Ramon, CA 94583__

Landlord's Phone Number — (415 ) __934-8652__     Tenant's Phone Number — (415 ) __837-7151__
     Guarantor: _____

BROKER: __Western Development Services Inc.__

Exhibits: The following exhibits are attached hereto and made a part hereof:

> Exhibit "A" — Legal Description of Shopping Center
> Exhibit "B" — Plot Plan of Shopping Center
> Exhibit "C" — Construction Exhibit
> Exhibit "D" — Sign Criteria

The following addenda are attached hereto and made a part hereof:

The Fundamental Lease Provisions are an integral part of this Lease and each reference in this Lease to any of the Fundamental Lease Provisions shall be construed to incorporate all of the terms provided under each such Fundamental Lease Provision. In the event of any conflict between any Fundamental Lease Provision and the balance of the Lease, the latter shall control. References to specific sections are for convenience and designate some of the sections where references to the particular Fundamental Lease Provisions appear.

Landlord's Initials _____

Tenant's Initials _____

(i)

# DUBLIN TOWN & COUNTRY
## SHOPPING CENTER LEASE
### INDEX

| SECTION | | | PAGE |
|---|---|---|---|
| | Fundamental Lease Provisions | | 1 |
| 1 | Leased Premises | | 1 |
| 2 | Initial Construction | | 1 |
| 3 | Term | | 1 |
| 4 | Rent | | 1 |
| | A | Fixed Minimum Rent | 1 |
| | B | Percentage Rent | 1 |
| | C | Consumer Price Index | 1 |
| | D | Tax on Rentals | 1 |
| | E | Late Charges | 2 |
| 5 | Gross Sales and Records | | 2 |
| 6 | Real Property Taxes and Assessments | | 2 |
| | A | Re Leased Premises | 3 |
| | B | Re Common Facilities | 3 |
| 7 | Personal Property Taxes and Assessments | | 3 |
| 8 | Common Facilities and Maintenance Expenses | | 3 |
| 9 | Utilities | | 3 |
| 10 | Signs, Fixtures, Restrictions Re Exterior | | 4 |
| 11 | Use of Leased Premises | | 4 |
| 12 | Conduct of Business | | 4 |
| 13 | Assignment and Subletting | | 5 |
| 14 | Security Deposit | | 5 |
| 15 | Financing | | 5 |
| 16 | Leasehold Priority and Subordination | | 6 |
| 17 | Compliance with Laws | | 6 |
| 18 | Subordination of Landlord's Lien | | 6 |
| 19 | No Partnership | | 6 |
| 20 | Insurance and Hold Harmless | | 6 |
| | A | Fire Insurance | 6 |
| | B | Liability Insurance | 6 |
| | C | Notice | 7 |
| | D | Hold Harmless and Waiver of Claims | 7 |
| | E | Waiver of Subrogation | 7 |
| 21 | Repairs, Maintenance, Alterations and Removal of Equipment | | 7 |
| 22 | Mechanic's Liens | | 7 |
| 23 | Fire and Casualty Damage | | 8 |
| 24 | Condemnation | | 8 |
| 25 | Default | | 8 |
| 26 | Surrender of Premises | | 9 |
| 27 | Force Majeure | | 9 |
| 28 | Offset Statements | | 10 |
| 29 | Rights Reserved by Landlord | | 10 |
| | A | Easements | 10 |
| | B | Inspection | 10 |
| | C | Accord and Satisfaction | 10 |
| 30 | Utility Rationing | | 10 |
| 31 | Merchants' Association | | 10 |
| 32 | Miscellaneous | | 10 |
| | A | Loss and Damage | 10 |
| | B | Lease Binding on Successors | 10 |
| | C | Attorneys' Fees | 11 |
| | D | Sale of Leased Premises | 11 |
| | E | Corporate Resolutions | 11 |
| | F | Notices | 11 |
| | G | Section Headings | 11 |
| | H | Gender and Interpretation of Terms and Provisions | 11 |
| | I | Time of Essence | 11 |
| | J | Impartial Construction | 11 |
| | K | Waiver | 11 |
| | L | Partial Invalidity | 11 |
| | M | Remainder of Shopping Center | 11 |
| | N | Tenant's Acknowledgement of Condition of Leased Premises | 11 |
| | O | No Option to Lease | 11 |
| | P | Waiver of Liability | 11 |
| | Q | Rights of Lenders | 12 |
| | R | Waiver of Jury Trial and Counterclaims | 12 |
| | S | Brokers | 12 |
| | T | Agreements in Writing | 12 |
| | U | Matters in Existence | 12 |
| | V | Law Governing | 12 |
| | W | Warranties of Tenant | 12 |

121779

**Section 1.   Leased Premises**

Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, space within a building, now, or hereafter to be constructed in the shopping center ("Shopping Center") more fully described in Exhibit "A" attached hereto and made a part hereof, which premises (the "Leased Premises") consist of a Leased Area as set forth in the Fundamental Lease Provisions. The location of the Leased Premises is outlined in red on the plot plan of the Shopping Center, which plot plan is marked Exhibit "B", attached hereto and made a part hereof. It is understood and agreed that prior to the commencement of the term hereof, Landlord may change the location of the Leased Premises; provided, however, any such relocation of the Leased Premises shall be subject to Tenant's approval. In the event Tenant does not approve said relocation, Tenant may cancel this Lease within ten (10) days of Landlord's notification to Tenant of such relocation, in which event any security or prepaid rent paid by Tenant shall be refunded to Tenant, and neither party shall thereafter have any further obligation to each other respecting this Lease. Tenant further agrees that Landlord may, at any time and from time to time, add additional property and improvements to the Shopping Center and that the tenants and uses for the building areas shown on Exhibit "B" (except for the Leased Premises) are subject to change at any time at Landlord's sole discretion. Tenant further acknowledges that Exhibit "B" hereto sets forth a proposed general layout of the Shopping Center, and shall not be deemed a representation by Landlord that the Shopping Center shall be constructed as indicated thereon or that any tenants or occupants designated by name or nature of business thereon shall conduct business in the Shopping Center during the term of this Lease; and Landlord may in its sole discretion, increase, decrease or change the size, shape, number, location, use and dimensions of the buildings, the premises therein, driving lanes, driveways, walkways, parking spaces and other improvements shown on Exhibit "B".

**Section 2.   Initial Construction**

In the event Landlord is to perform construction with respect to the Leased Premises, the responsibility for the performance of such construction and payment therefor is set forth in Exhibit "C" attached hereto and made a part hereof. In the event Tenant shall fail within any time limits which may be provided herein or in Exhibit "C" hereto to complete any work or perform any other requirements provided to be performed by Tenant prior to the commencement of the term hereof, or in the event Tenant shall cause a delay in the completion of any work, Landlord may send Tenant written notice of such default and if such default is not corrected within ten (10) days thereafter, Landlord may by written notice prior to the curing of said default terminate this Lease. In such event, Landlord shall be entitled to retain as liquidated damages all deposits made hereunder and such improvements as Tenant may have annexed to or installed in the Leased Premises or upon the building within which the same are located.

**Section 3.   Term**

A.  The term of this Lease shall commence on the date that Landlord, or Landlord's agent so authorized in writing by Landlord, tenders possession of the Leased Premises herein to Tenant, or notifies Tenant thereof in writing, which date shall be termed the Date of Possession. Tenant covenants to open the Leased Premises for business to the general public not later than sixty (60) days from the Rent Commencement Date set forth in the Fundamental Lease Provisions.

B.  Tenant's obligation to pay rent, and all other sums and charges reserved unto Landlord hereunder, shall commence upon the earlier to occur of the following dates: (a) the Rent Commencement Date set forth in the Fundamental Lease Provisions, or (b) the date on which the Tenant shall open the Leased Premises for business.

C.  The term of this Lease shall be for the number of lease years set forth in the space provided for "Lease Term" in the Fundamental Lease Provisions. In the event the term hereof has not commenced on or before three (3) years from the date hereof, this Lease shall automatically terminate. The term "Lease Year" as used herein shall mean a period of twelve (12) consecutive full calendar months. The first Lease Year shall begin on the Rent Commencement Date, if the Rent Commencement Date shall occur on the first day of a calendar month. If not, then the first Lease Year shall commence upon the first day of the calendar month next following the Rent Commencement Date. Each succeeding Lease Year shall commence upon the anniversary date of the first Lease Year.

**Section 4.   Rent**

A.  Fixed Minimum Rent. Tenant shall pay to Landlord at the address of Landlord as set forth in the Fundamental Lease Provisions, or at such other place as may be designated by Landlord, without prior demand therefor, and without any deduction or offset whatsoever, as and as Initial Fixed Minimum Rent in the Fundamental Lease Provisions, each calendar year, payable monthly, in advance, in the amount as set forth Minimum Annual Rent in the Fundamental Lease Provisions as Fixed Minimum Monthly Rent (subject to adjustment as set forth in Section 4.C. hereof) the amount set forth and designated as Fixed in the Fundamental Lease Provisions as Fixed Minimum Monthly Rent (subject to adjustment as set forth in Section 4.C. hereof).

If the Rent Commencement Date shall occur upon a day other than the first day of a calendar month, then Tenant shall pay, upon the Rent Commencement Date, a pro rata portion of the Fixed Minimum Monthly Rent described in the foregoing paragraph prorated on a per diem basis with respect to the fractional calendar month preceding the commencement of the first Lease Year hereof.

B. ~~Percentage Rent. In addition to the Fixed Minimum Rent hereinabove set forth, Tenant shall pay to Landlord at the time and in the manner herein specified, as Percentage Rent hereunder, a sum equivalent to the amount, if any, by which that certain percentage of the gross sales (as defined in Section 5) set forth in the Fundamental Lease Provisions in each month exceeds the Fixed Minimum Rent which is paid during, and with respect to, the same month.~~

Within ten (10) days after the end of each calendar month of the term hereof, commencing with the tenth day of the month following the Rent Commencement Date, and ending with the tenth day of the month next succeeding the last month of the Lease Term, Tenant shall furnish to Landlord a statement in writing, certified by Tenant (and if Tenant is a corporation, by an officer of Tenant) to be correct, showing the total gross sales made in, upon or from the Leased Premises (together with deductions or offsets therefrom as permitted by Section 5.A. hereof) during the preceding calendar month, and shall accompany each such statement with a payment to Landlord equal to the percentage set forth in the Fundamental Lease Provisions under "Percentage Rent" of the total monthly gross sales made in, upon or from the Leased Premises during each calendar month, less the Fixed Minimum Monthly Rent for such preceding calendar month, if previously paid. Within twenty (20) days after the end of each Lease Year of the term hereof, Tenant shall furnish to Landlord a statement in writing, certified by Tenant (and if Tenant is a corporation, by an officer of Tenant) to be correct, showing the total gross ~~sales made in, upon or from the Leased Premises during the preceding Lease Year.~~

C.  Consumer Price Index. Upon the expiration of twelve (12) calendar months after the Rent Commencement Date, and upon expiration of each twelve(12) calendar month period thereafter, the Fixed Minimum Annual Rent shall be adjusted by multiplying the Fixed Minimum Annual Rent as referenced in the Fundamental Lease Provisions herein by a fraction, which fraction shall have as its

121779                                        1

Landlord's Initials _____

Tenant's Initials _____

numerator the Consumer Price Index for Urban Wage Earners and Clerical Workers (Revised) (All Items), for the metropolitan area closest to the Leased Premises for which such Consumer Price Index (or alternative thereto as hereinafter provided) is maintained, (Base Period 1967 = 100), as published by the U. S. Department of Labor, Bureau of Labor Statistics, upon, or in effect as of, the date of ex-piration of the applicable twelve month period, and which such fraction shall have as its denominator said Consumer Price Index as published upon, or in effect as of, the date of the commencement of the term of this Lease. If the present base of said Index should hereafter be changed, then the new base shall be converted to the base now used. In the event that said Bureau should cease to publish said Index figure, then any similar index published by any other branch or department of the U.S. Government shall be used, and if more than one is so published, then the index showing the greater proportionate increase shall be used, and if none is so published then another index generally recognized as authoritative shall be substituted by agreement of the parties hereto, or if no such agreement is reached within a reasonable time, either party may make application to any court of competent jurisdiction to designate such other index. In any event, the base used by any new index shall be reconciled to the 1967 = 100 base Index. In no event shall the Fixed Minimum Annual Rent be less than the Fixed Minimum Annual Rent set forth in the Fundamental Lease Provisions, or the Fixed Minimum Rent as adjusted with respect to the next preceding twelve (12) month period, whichever is the greater. In the event the numerator of said fraction is not available at the time of adjustment of the Fixed Minimum Annual Rent as provided herein, Tenant shall continue to pay the Fixed Minimum Annual Rent as said Fixed Minimum Annual Rent established for the next prior twelve (12) month period; provided, however, Tenant shall promptly pay to Landlord any deficiency at such time as said Fixed Minimum Annual Rent is adjusted. In any event, the Fixed Minimum Monthly Rent shall be one-twelfth (1/12) of Fixed Minimum Annual Rent, as adjusted hereunder.  See Addendum

D. **Tax on Rentals.** Tenant shall further pay to Landlord, within five (5) days of billing therefor, any and all excise, privilege, rent in lieu of, ad valorem, and other tax(es) (herein ''Tax'') levied or assessed by any governmental authority upon or measured by any rent or other sums payable by Tenant to, or on behalf of, Landlord, pursuant to the terms of this Lease or by virtue of the tenancy created by this Lease. Such Tax shall be paid by Tenant whether or not it comprises a portion of any real property tax or taxes or real property tax bills, and such Tax shall include, without limitation, any new tax of a nature not presently in effect but which may be hereafter levied, assessed or imposed upon the Landlord, or the Leased Premises, if such new tax shall be based on or arise out of the ownership, use, or operation of the Leased Premises, or any portion thereof or right thereto. Nothing contained herein shall be construed to require Tenant to pay any estate, gift, inheritance or net income tax of Landlord.

E. **Late Charges.** Tenant hereby acknowledges that late payment by Tenant to Landlord of the Fixed Minimum Monthly Rent or other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be impos-ed upon Landlord by the terms of any mortgage or trust deed covering the Leased Premises. Accordingly, if any installment of Fixed Minimum Monthly Rent or any sum due from Tenant hereunder shall not be received by Landlord or Landlord's designee on or before the time set forth herein for the payment thereof then said amount shall be deemed past due, and Tenant shall pay to Landlord a late charge equal to Fifty and 00/100 Dollars ($50.00), plus any attorneys' fees incurred by Landlord by reason of Tenant's failure to pay such Fixed Minimum Monthly Rent or other charges when due hereunder. Landlord and Tenant hereby agree that such late charge represents a fair and reasonable estimate of the cost that Landlord will incur by reason of any such late payment by Tenant. Acceptance of any such late charge by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder. Landlord, at its option, may deduct any such amount so unpaid together with such late charge, from any security deposit held by Landlord pursuant to the terms of Section 14.A. hereof and, in such event, Tenant shall deposit forthwith a like amount as that so deducted with Landlord in accordance with the terms of Section 14.B. hereof.

F. It is the intention of the Landlord and Tenant that the Fixed Minimum Rent, Percentage Rent, and other sums and charges pro-vided herein shall be absolutely net to Landlord, and Tenant shall pay all costs, charges, obligations, assessments, and expenses of every kind and nature against, or relating to, the Leased Premises or the use, operation, management, or occupancy thereof, whether or not now customary or within the contemplation of the parties hereto, which may arise or become due during the term hereof, and which, except for the execution and delivery of this Lease, would have been payable by Landlord. Nothing contained herein shall be construed to require Tenant to pay any interest or principal payments on, or expenses in connection with, any mortgage or other encumbrance placed by Landlord on the Leased Premises, or any part thereof.

## Section 5.   Gross Sales and Records

A. ~~The term ''Gross Sales'', as used herein is hereby defined to mean the total amount of sales and other revenue from all businesses~~ conducted on or from the Leased Premises, whether such businesses be conducted by Tenant or by any licensees, concessionaires, or subtenants of Tenant, and whether such sales be evidenced by cash, check, credit, credit card, charge account, exchange, or otherwise, without regard as to whether or not collection is made of the amounts for which credit is given, and shall include, but not be limited to, the amounts received for the sale of food, beverages, goods, wares and merchandise, the amounts received for services performed on or at the Leased Premises, the amounts received for equipment and other rentals, and the amounts of all fees and similar payments received for whether or not such orders be filled from the Leased Premises or elsewhere, and whether such sales be made by means of merchandise or the Lease Year during which such sale, charge or transaction is made. If any one or more departments or divisions of Tenant's other vending devices in the Leased Premises, together with the amount of all orders taken or received at the Leased Premises, business shall be sublet by Tenant or conducted by any person, firm or corporation other than Tenant, then there shall be included in Gross Sales for the purpose of fixing the Percentage Rent payable hereunder, all of the Gross Sales of such departments or divisions, whether such sales be made at the Leased Premises or elsewhere, in the same manner and with the same effect as if the business or sales of such departments and divisions of Tenant's business had been conducted by Tenant itself. There shall be deducted from Gross Sales the sales price of merchandise returned by customers for exchange, provided that the sales price of the merchandise delivered to the customer in exchange shall have been included in Gross Sales. Gross Sales shall not include the amount of any sales, use or gross receipt tax imposed by any federal, state, municipal or governmental authority directly on sales collected from customers, provided that the amount thereof is added to the selling price or absorbed therein, and paid by Tenant to such government authority. No franchise or capital stock tax and no income tax or similar tax based upon income or profits as such shall be deducted from Gross Sales in any event whatsoever.

B. Tenant shall keep in the Leased Premises true and complete records and accounts of all sales and business transacted. Landlord shall have the right, during normal business hours of Landlord, and from time to time, to audit all of the books of account, bank statements, documents, records, sales tax reports, returns, papers and files of Tenant relating to Gross Sales and business transacted in, upon or from the Leased Premises, and, on request by Landlord, Tenant shall make all such matters available for examination at the Leas-ed Premises. Tenant shall keep and preserve for at least three (3) years after the end of each Lease Year all sales slips, cash register tape ~~readings, sales books, sales tax reports, and other evidence of Gross Sales and business transacted for such year.~~

2

Landlord's Initials

Tenant's Initials

to Landlord shall have an audit made for any Lease Year and the Gross Sales and business transacted shown by Tenant's state-
ment for such year should be found to be understated by more than two percent (2%), or, in the event that such audit is made as a result of
Tenant's failure to prepare and deliver, within the time specified in this Lease, any of the statements of gross sales as required by the terms
of this Lease, Tenant shall immediately pay to Landlord the cost of such audit; otherwise, the cost of such audit shall be paid by Landlord.
Landlord's right to have such audit made with respect to any Lease Year shall expire three (3) years after each Lease Year. The statement
or statements so prepared pursuant to any audit shall be conclusive on Tenant.

## Section 6.   Real Property Taxes and Assessments

A. Re Leased Premises. In addition to the rent and other sums due hereunder, Tenant shall pay and discharge, not later than ten (10)
days subsequent to billing therefor and before any penalties or interest shall accrue thereon, all taxes, assessments (general and special) and
other impositions or charges which may be taxed, charged, levied, assessed or imposed upon all or any portion of or in relation to the
Leased Premises, the land thereunder, the building and improvements within which the same are located, and the appurtenances or use
thereof, or upon any leasehold estate in the Leased Premises, or measured by the rent from the Leased Premises; or any tax previously in-
cluded within the definition of a real property tax, or any replacement thereof provided, however, that in the year in which the term hereof
shall commence and in the year in which it shall expire such taxes, assessments, impositions and other charges shall be prorated between
Landlord and Tenant. If the Leased Premises are not separately assessed, then the taxes, assessments and other charges shall be apportion-
ed according to the leased area in the Leased Premises in relation to total floor area of all buildings, including, without limitation, the
building within which the Leased Premises are located, excluding mezzanines, included in the specific land area encompassed by, or in-
cluded within, the assessment. Landlord shall have the right to collect and impound such taxes, assessments, impositions and charges and,
in such event Tenant shall pay the same, on a monthly basis, in advance, for Tenant's account based upon Landlord's reasonable estimate
of the amount thereof next due, and Tenant shall pay to Landlord such tax impounds upon the basis and at the times hereinbefore describ-
ed for the payment of rent. If the foregoing method of impounds is elected by Landlord, at the end of each calendar year (or fiscal year
elected by Landlord), the actual taxes, assessments and other charges shall be reported by Landlord to Tenant. If Tenant's share of the ac-
tual taxes, assessments and other charges for any such year exceeds the amount paid by Tenant to Landlord, Tenant shall promptly reim-
burse Landlord for the amount of excess provided, however, if Tenant's share for any such year is less than said amount, Landlord shall
promptly refund the difference to Tenant, without liability for interest therefor. At the end of each such year the monthly payment to be
made by Tenant shall be adjusted so that the monthly payments for the next year will be equal to an amount reasonably estimated by
Landlord to be one-twelfth (1/12) of Tenant's annual share of such taxes, assessments and other charges, as aforesaid. Landlord shall not
be required to separate amounts so impounded from impounds of its other tenants in the Shopping Center, nor shall Landlord be required
to pay any interest on such impounds. Landlord shall not be required to segregate amounts so impounded from impounds of its other
tenants in the Shopping Center, nor shall Landlord be required to pay any interest on such impounds. Tenant hereby agrees to protect and
hold harmless Landlord and the Leased Premises from all liability for Tenant's share of any and all such taxes, assessments and charges
together with any interest, penalties, or other charges thereby imposed, and from any sale or other proceedings to enforce payment
thereof.

B. Re Common Facilities. Tenant shall further reimburse Landlord for Tenant's share of all taxes, assessments (general and special)
and other impositions or charges which may be taxed, charged, levied, assessed or imposed on all or any portion of, or in relation to, the
Common Facilities (as defined in Section 8 of this Lease) or any parking spaces or parking lot thereon; provided, however, that in the year
that this term shall commence and in the year in which it shall expire, Tenant's share of such taxes, assessments and other charges shall be
prorated between Landlord and Tenant. As used in this paragraph, "Tenant's share" shall mean the fraction in which the numerator is
the number of square feet in the Leased Premises and the denominator is the total square feet in all buildings, including without limitation
the building within which the Leased Premises are located, excluding mezzanines, leased or leaseable, in the Shopping Center (excluding
therefrom, however, any portion of the Shopping Center not owned or leased by Landlord unless the same is to be included nevertheless in
the denominator of such fraction by virtue of any written instrument duly approved and executed by Landlord, or its predecessors in in-
terest). Said share shall be determined as of the amount of leaseable square feet ready for occupany as of the Rent Commencement Date,
and thereafter as of the assessment date for each tax year of the term hereof, as determined by Landlord. In the event the Common Areas
are not separately assessed from other areas of the Shopping Center, Landlord shall allocate such taxes, assessments and other charges
between the land and improvements constituting the Common Areas and all other land and improvements within the area so assessed.
Tenant further agrees, upon request of Landlord, to pay Tenant's share of such taxes, assessments, impositions and other charges in in-
stallments by means of an impound system as more fully set forth in Section 6.A. above.

## Section 7.   Personal Property Taxes and Assessments

During the term hereof, Tenant shall cause all taxes, assessments and other charges levied upon or against any fixtures or personal
property situated in, on or about the Leased Premises to be levied and assessed separately from the Leased Premises and to be paid before
the same becomes a lien upon said Leased Premises; provided, however, that if for any reason any of such taxes, assessments, or other charges
shall not be so separately assessed, Tenant shall nevertheless pay the same as set forth herein, or reimburse Landlord therefor, all within
ten (10) days of receipt of billing thereof.

## Section 8.   Common Facilities and Maintenance Expenses

A. Landlord hereby grants to the customers, patrons, suppliers, and employees of Tenant, during the term of this Lease, a non-
exclusive license to use the designated parking areas in the Shopping Center for the use of parking motor vehicles incident to, and in con-
nection with, the conduct of Tenant's business on the Leased Premises subject to the rights reserved to Landlord as hereinafter contained.
Landlord reserves the right at any time and from time to time to grant similar non-exclusive use to other tenants and invitees; to
promulgate rules and regulations relating to the use of the Common Facilities including parking areas, or any part thereof, including
reasonable restrictions on parking by tenants and employees of tenants (together with the right to designate employee parking areas, or to
require such tenants and employees of tenants to park outside of the Shopping Center); to designate specific spaces for the use of any
tenant and the customers, patrons, and suppliers thereof; to make changes in Common Facility layout from time to time; to add addi-
tional property to the Common Facilities; to withdraw property from Common Facility use to establish reasonable time limits upon
customer parking; to close temporarily all or any portion of the parking areas or Common Facilities, and to do and perform any other acts
in and to said areas and improvements as Landlord determines to be advisable. Tenant agrees to abide by and conform with such rules and
regulations; to cause its concessionaires, and its and their employees and agents, to so abide and conform; and to use its best efforts to
cause its customers, invitees and licensees to so abide and conform. Tenant further agrees, on behalf of itself, its employees and agents,
not to engage in the solicitation of business in any Common Facility or parking or other common area. Such solicitation so prohibited
hereby shall include, without limitation, distribution of handbills or other advertising media to or in automobiles in the Common

Landlord's Initials _____

Tenant's Initials _____

the use of pickets in such areas, the use of loud speaker systems which are audible in such areas, and the displaying of any of Tenant's merchandise or the posting of any signs not expressly authorized hereunder in such areas. Delivery and commercial vehicles which serve the leased premises whether or not owned or operated by Tenant, shall be parked outside of the Shopping Center except during periods of loading and unloading thereof.

B. Landlord shall, except as otherwise provided herein, operate the Common Facilities during the term hereof. The manner in which the Common Facilities shall be operated and the expenditures therefor shall be in Landlord's judgment. Landlord reserves the right to appoint a substitute operator, including, but not limited to, any tenant in the Shopping Center, to carry out any or all of Landlord's rights and duties with respect to the Common Facilities as provided in this Lease. Landlord shall not be liable for any inconvenience or interruption of business or other consequences resulting from the making of repairs, replacements, improvements, alterations, or additions, or from the doing of any other work, by or at the direction of Landlord, or Landlord's delegatee, to or upon any of such Common Facilities. Tenant shall pay to Landlord, in addition to the rent heretofore specified, as further and additional rent, a proportion of the operating costs of the Common Facilities based upon the ratio of square feet of leased area in the Leased Premises to the total square feet of floor area, (excluding mezzanines), of all buildings, including, without limitation, the building within which the Leased Premises are located, in the Shopping Center. Said amount shall be determined by the amount of leaseable square feet ready for occupancy as of the Rent Commencement Date, and thereafter as of the first day of each calendar year of the term hereof, as determined by Landlord. For the purposes of this paragraph, the "Operating Costs" shall mean the total costs and expenses incurred in operating, insuring, maintaining, and repairing the Common Facilities, including, without limitation, gardening and landscaping, costs of public liability and property damage insurance, cleaning, sweeping, replacements, repairs, line painting, lighting, sanitary control, removal of snow, ice, trash, rubbish, garbage, and other refuse, costs of any public address, loudspeaker or music system, depreciation of machinery and equipment used in such maintenance, reasonable reserves for anticipated expenditures, the cost of personnel to implement such services, to direct parking, and to police the Common Facilities, any parking charges or other costs levied, assessed or imposed by, or at the direction of, or resulting from, statutes or regulations, or interpretations thereof, promulgated by any governmental authority in connection with the use or occupancy of the Leased Premises or the parking facilities servicing the Leased Premises, and in addition thereto, an administrative and overhead expense in an amount equal to fifteen percent (15%) of all the foregoing costs. "Common Facilities" shall mean all areas, space, equipment, and special services now, or at any time hereafter, provided or designated by Landlord for parking and ingress and egress, and/or for the common and joint use and benefit of the occupants of the Shopping Center, including, without limitation, parking area, access roads, driveways, retaining walls, landscaped areas, truck serviceways, loading docks, pedestrian malls, courts, stairs, ramps, sidewalks, and restrooms.    *(including differences in condition coverage).

C. Tenant shall pay Landlord each month of the term hereof, in advance, a sum equal to an amount estimated by Landlord, and of which Tenant has been given notice, to be one-twelfth (1/12) of Tenant's annual proportion of the operating costs of the Common Facilities. At the end of each calendar year (or fiscal year elected by Landlord) the actual costs shall be reported by Landlord to Tenant. If Tenant's share of the actual costs for any such year exceeds the amount paid by Tenant to Landlord, Tenant shall promptly reimburse Landlord for the amount of excess; provided, however, if Tenant's share for any such year is less than said amount, Landlord shall promptly refund the difference to Tenant, without liability for interest therefor. At the end of each such year the monthly payment to be made by Tenant shall be adjusted so that the monthly payments for the next year will be equal to an amount reasonably estimated by Landlord to be one-twelfth (1/12) of Tenant's annual proportion of the operating costs of the Common Facilities as aforesaid. Tenant further agrees that in addition to the foregoing, and in the event Tenant requires, and Landlord provides, lighting of the Common Facilities, or any portion thereof, beyond the normal or customary business hours of the Shopping Center, Tenant shall pay to Landlord, as further and additional rent, all costs incurred with respect thereto by Landlord.

## Section 9.    Utilities

Tenant shall pay or cause to be paid, prior to delinquency, all charges for water, gas, sewer, electricity, light, heat, air conditioning, power, telephone or other service used, rendered or supplied in connection with the Leased Premises, together with any assessments or surcharges with respect thereto, and shall contract for the same in Tenant's own name, and shall protect Landlord and the Leased Premises from any such charges. Tenant's obligations hereunder shall commence as of the Date of Possession as referenced in Paragraph 3 hereof. Tenant shall pay Landlord for any utilities or services furnished by Landlord, but Landlord shall not be obligated to furnish any utilities or services, nor does Landlord make any warranty or representation as to the quantity, quality, availability, amount or duration of any such utilities or services. In the event any such utilities are provided by Landlord by a common meter, Tenant shall pay to Landlord, upon demand, Tenant's prorata share of the cost thereof, which share shall be apportioned according to the number of square feet of floor area in the Leased Premises to the total floor area of the units or buildings which are so served by said common meter, and which are utilizing such utilities.

## Section 10.    Signs, Fixtures, Restrictions Re Exterior

A. All fixtures installed by Tenant shall be new or completely reconditioned. Tenant shall not make or cause to be made any alterations, additions or improvements to the building within which the Leased Premises are located, or install or cause to be installed or used, any exterior signs, floor covering, exterior lighting, plumbing fixtures, shades or awnings, radio or television antennae, loud speakers, sound amplifiers or similar devices, or make any changes to the storefront or exterior of the said building without first obtaining Landlord's written approval. Tenant shall present to the Landlord plans and specifications for such work at the time approval is sought. Tenant shall make no use of the roof.

B. Tenant will not place or suffer to be placed or maintained on any exterior door, roof, wall or window of the building within which the Leased Premises are located any sign, awning or canopy, or advertising matter or other thing of any kind, and will not place or maintain, or permit, or suffer to be placed or maintained, any decoration, lettering or advertising matter on the glass of any window or door of the said building within which the Leased Premises are located without first obtaining Landlord's written approval. In no event shall any: (a) neon, flashing or moving sign(s), or (b) sign(s) which shall interfere with the visibility of any sign, awning, canopy, advertising matter, or decoration of any kind of any other business or occupant of the Shopping Center of which the Leased Premises are a part, be permitted hereunder. Tenant further agrees to maintain any such sign, awning, canopy, decoration, lettering, advertising matter or other thing as may be approved in good condition and repair at all times. Tenant shall not place or suffer to be placed any merchandise, equipment or other items outside the building within which the Leased Premises are located. Landlord, without liability therefor, at Tenant's cost, may remove, without notice, any item placed, constructed, or maintained, upon or outside of any roof, wall or window of the building within which the Leased Premises are located that does not comply with the provisions of this paragraph.

## Section 11.    Use of Leased Premises

A. Tenant shall use the Leased Premises only for the purpose or purposes expressly set forth in the Fundamental Lease Provisions and for no other purpose. The Leased Premises shall be used under the trade name set forth in the Fundamental Lease Provisions and no other. Tenant understands and agrees that neither the enumeration in Subparagraph B.; hereof, or the deletion from said Subparagraph B., of various specific purposes for which the Leased Premises cannot be used or occupied does not, directly or by implication, permit the

Landlord's Initials

Tenant's Initials

use of occupancy of the Leased Premises for any purpose other than as specifically provided in the Fundamental Lease Provisions, and Tenant acknowledges and agrees that Tenant shall use the store space leased and demised hereby only as expressly set forth in and permitted by the Fundamental Lease Provisions of this Lease.

B. If Tenant violates any of the provisions of this Section 11, Landlord: (1) may cancel this Lease by giving three days' written notice to Tenant, and/or (2) may pursue any other remedy available at law or equity. Tenant acknowledges and agrees that it shall have no right of subdivision, separation, or partition of the Leased Premises, or any portion thereof, from the Shopping Center, or building, within which the Leased Premises are located. Easements for light and air are not included in the Leased Premises.

C. Any use of the Leased Premises permitted to Tenant, as set forth in the Fundamental Lease Provisions, shall constitute a non-exclusive permission, subject to the terms of this Lease, to maintain such use within the Shopping Center and Landlord reserves the right to permit identical or similar uses by other tenants of other space within the Shopping Center. Restrictions upon use contained within this Lease are for the benefit of Landlord, and there is no covenant, express or implied, by Landlord to include similar restrictions within other leases which may be applicable to the Shopping Center. Landlord reserves the right to alter uses permitted for other tenants or occupants within the Shopping Center and any such action by Landlord is separate and independent of any obligation to Tenant under this Lease. No right of Tenant under or pursuant to this Lease shall extend to, affect, or pertain to any real property (whether or not owned, leased, constructed, developed, managed or operated by Landlord, its successors and assigns, at any time whatsoever) outside of the boundaries of the Shopping Center, as described in, and defined by, Exhibit "A" hereto.    Landlord shall not lease to another dry cleaners.

## Section 12.   Conduct of Business

During all usual business hours, and on all such days as comparable businesses of like nature in the area are open for business, and in any event, during such business hours as the majority of tenants of the Shopping Center are open for business, Tenant shall occupy, use, and operate the entire Leased Premises for the purposes specified herein. This requirement shall not apply during times when the Leased Premises are untenable by reason of fire or other casualty; provided, however, Tenant shall continue operation of its business to the extent reasonably practicable from the standpoint of good business during any period of reconstruction or repair. In general, Tenant shall operate the business conducted by it on the Leased Premises in a manner calculated to produce the maximum profitable and practical volume of sales and transactions obtainable and to enhance the reputation and attractiveness of the Leased Premises.   Tenant's hours of business shall be Monday through Friday 7:00 a.m. to 7:00 p.m.;Saturday, 8:00 a.m. to 6:00 p.m.  Closed on Sunday.

## Section 13.   Assignment and Subletting

Tenant shall not sublet or assign this Lease, whether in whole or in part, or any interest therein, without first obtaining Landlord's written consent, which said consent shall not be unreasonably withheld.

In the event Landlord's withholding of consent is found to be unreasonable by any court of competent jurisdiction, Tenant's sole remedy shall be to have the proposed assignment or subletting declared valid as if Landlord's consent had been given.

Notwithstanding any such subletting or assignment, Tenant shall remain fully and primarily liable for the payment of all rental and other sums due, or to become due hereunder, and for the full performance of all other terms, conditions and covenants to be kept and performed by Tenant. The acceptance of rent or any other sum due hereunder, or the acceptance of performance of any other term, covenant, or condition hereof, from any other person or entity shall not be deemed to be a waiver of any of the provisions of this Lease or a consent to any subletting or assignment of the Leased Premises. Each subtenant or assignee acquiring this Lease by acceptance of any sublease, assignment or transfer by operation of law shall assume, be bound by, and be obligated to perform the terms and conditions of its sublessor or assignor under this Lease. This Lease shall not, nor shall any interest therein, be assignable as to Tenant's interest by operation of law, assignment for the benefit of creditors, voluntary or involuntary bankruptcy or reorganization, or otherwise, without the prior written consent of Landlord.

If Tenant is a corporation, and if at any time during the term of this Lease any part or all of the corporate shares of Tenant shall be transferred by sale, assignment, operation of law or other disposition (except where shares are transferred on death by bequest or inheritance) so as to result in a change in the present effective voting control of Tenant by the person or persons owning a majority of said corporate shares on the date of this Lease, Tenant shall promptly notify Landlord in writing of such change, and such change shall, if not previously consented to in writing by Landlord, which consent shall not be unreasonably withheld, be deemed an assignment without consent of Landlord in violation of the first paragraph of this Section 13.

Any assignment or sublease in violation of this Lease shall, at the option of the Landlord, be void. Tenant further agrees to reimburse Landlord for all reasonable expenses incurred with respect to any such assignment or subletting, such expenses in no event to be less than One Hundred Fifty and 00/100 Dollars ($150.00).

## Section 14.   Security Deposit

A. Tenant has deposited with Landlord as a security deposit, and not as prepaid rent, the sum set forth in the Fundamental Lease Provisions, as "Security Deposit" which sum shall be retained by Landlord, without liability for interest, as security for the faithful performance by Tenant of all the terms, covenants and conditions under this Lease by Tenant to be kept and performed. The security deposit shall be returned to Tenant upon the expiration of this Lease, if Tenant is not then in default and confirmation by Landlord that the Leased Premises have been delivered to Landlord in the condition required by Section 26. In no event shall such security deposit be in lieu of, constitute, or excuse Tenant from paying, any portion of the Fixed Minimum Rent or other sums or charges to be paid by Tenant hereunder at any time during the term hereof. The taking of such security by Landlord shall in no way be a bar or defense to any action in unlawful detainer or for the recovery of the Leased Premises or for any other action which Landlord may at any time institute for the breach of any term, covenant or condition contained herein.

B. In the event of failure of Tenant to keep and perform any of the terms, covenants and conditions of this Lease to be kept and performed by Tenant during the term of this Lease, or any renewals, or extensions thereof, then Landlord at its option may appropriate and apply said entire deposit, or so much thereof as may be necessary, to compensate Landlord for any loss or damage sustained or suffered by Landlord due to such breach on the part of Tenant. Should the entire deposit, or any portion thereof, be appropriated and applied by Landlord for the payment of overdue rent or other sums due and payable to Landlord by Tenant hereunder, then Tenant shall, upon the demand of Landlord, forthwith remit to Landlord a sufficient amount of cash to restore said security to the original sum deposited, and Tenant's failure to do so within five (5) days after receipt of such demand shall constitute a default under this Lease.

C. In the event this Lease is executed prior to substantial completion of the Leased Premises, and Landlord thereafter, but prior to the commencement of the term hereof, elects not to complete the same, Landlord shall have no liability for failure so to do provided that Landlord returns the security deposit to Tenant, in which event this Lease shall have no further force and effect. It is further agreed that Landlord may deliver the funds deposited hereunder by Tenant to any purchaser of Landlord's interest in the Leased Premises, in the event that such interest be sold, and thereupon Landlord shall be discharged from any futher liability with respect to such deposit and this Lease.

121779                                                       5                       Landlord's Initials _____
                                                                                    Tenant's Initials _____

**Section 15.  Financing**

It is mutually understood and acknowledged that Landlord may, from time to time, finance the construction of, and/or improvements within, the Shopping Center, and that a mortgage company, or companies, must approve this Lease, and, in order to receive such approval, this Lease may have to be amended or modified. Provided that the term hereof shall not be altered nor Tenant's obligation to pay; (1) rent, or (2) its share of taxes, insurance and Common Facilities proration charges be increased thereby, Tenant agrees that it shall consent to and execute any such amendment or modification of this Lease as may be requested by said mortgage company or companies within seven (7) days of Landlord's request therefor. It is agreed, however, that no such amendment or modification shall be required of Tenant after the date of commencement of the term hereof. In the event Tenant fails to consent to any such amendment or modification, Landlord, at its option, may cancel and terminate this Lease upon written notice to Tenant, without further liability to either party hereto. No obligations of Tenant under this Lease specifically including but not limited to payment of rent or payment of its share of taxes, insurance, or common facilities proration charges shall be increased thereby.

**Section 16.  Leasehold Priority and Subordination**

Tenant agrees, that upon written request of Landlord, Tenant will execute, acknowledge and deliver any and all instruments requested by Landlord which are necessary or proper to effect the subordination of this Lease to any mortgage or deed of trust. Should the Leased Premises be acquired by any person or entity in connection with any proceeding under the terms of any such mortgage or deed of trust, this Lease shall, at the option of such person, continue in full force and effect for so long as Tenant is not in default hereunder and Tenant hereby attorns and agrees to attorn to such person or entity.

**Section 17.  Compliance with Laws**

A. Tenant shall promptly comply with all laws, ordinances, orders and regulations affecting the Leased Premises, and the building in which the same are situated and their cleanliness, safety, occupation and use. Tenant shall not do or permit anything to be done in or about the Leased Premises, or bring or keep anything in the Leased Premises that will in any way increase the rate of fire insurance upon the Leased Premises or the building in which the Leased Premises are situated or on any other building in the Shopping Center. Tenant shall not perform any acts or carry on any practices that may injure adjoining buildings or be a nuisance or menace to other persons or businesses in the area or disturb the quiet enjoyment of any person. Tenant shall not conduct or, with knowledge, permit to be conducted any waste or public or private nuisance on the Leased Premises or any portion of the Shopping Center within which the same are located. It is further agreed between Landlord and Tenant that Tenant will protect, indemnify, defend and save and keep Landlord, its agents, servants, employees, and/or its successors or assigns forever harmless and indemnified from and against any and all liability, penalties, damages, costs, expenses and attorneys' fees arising out of or by reason of; (a) any accident or other occurrence on or about the Leased Premises causing injury to persons or property whomsoever or whatsoever and Tenant will protect, indemnify, and save and keep harmless Landlord against and from any and all claim, loss, damage or expense arising out of any failure of Tenant in any respect to comply with the performance of all of the requirements and provisions of this Lease, and (b) Tenant's failure to prevent any employee, or any other person, from entering upon, or remaining in, any employment or place of employment upon the Leased Premises which is not safe, or which does not comply with the terms of the Occupational Safety and Health Act of 1970 (29 USC Section 651, et seq) and all other applicable laws pertaining thereto as they may now or hereafter exist and apply to the Leased Premises. *except the conduct of a dry cleaning business.  Tenant will not indemnify and hold Landlord harmless from any injuries occuring on the leased premises which are caused by the negligence of the Landlord or any of its agents.

**Section 18.  Subordination of Landlord's Lien**

Landlord, within ~~reasonable~~ ten days time after demand from Tenant, shall execute and deliver any document required by any bona fide supplier, lessor, or lender, in connection with the installation in the Leased Premises of Tenant's personal property or Tenant's trade fixtures, in which Landlord subordinates to the lien of such supplier, lessor, or lender any rights it may have or acquire with respect to that property, if the said supplier, lessor, or lender agrees in writing that, for so long as it possesses any interest therein or claim thereto, it will remove that property from the Leased Premises within fifteen (15) days of the expiration, or earlier termination, of the term of this Lease, and that in any such event, it will make, forthwith, all repairs and restoration to the Leased Premises that are necessitated by removal of such fixtures and property. Tenant conveys and grants unto Landlord a lien, secured by all of said personal property and trade fixtures at any time in or upon the Leased Premises, not inconsistent with the foregoing provisions of this Section 18, and Tenant shall execute and deliver unto Landlord, upon request, such instruments and documents as are requested by Landlord, to secure unto Landlord, Landlord's security interest therein. Upon the expiration of the term hereof, and provided Tenant is not in default hereunder, Landlord shall, upon request, execute such release of said lien as may be requested by Tenant. In the event of any default hereunder, Landlord may, in addition to all other rights of Landlord hereunder, and at law or equity, proceed to foreclose upon such lien, and to otherwise levy upon the same.

**Section 19.  No Partnership**

Notwithstanding any other express or implied provision of this Lease, Landlord shall not, in any way or for any purpose, become or be deemed to be a partner of Tenant, in its business or otherwise, or a joint venturer, or a member of any joint enterprise with Tenant.

**Section 20.  Insurance and Hold Harmless**

A. Fire Insurance. During the term hereof, Landlord shall keep the buildings and improvements within which the Leased Premises are located, insured against loss or damage by fire, with extended coverage and vandalism and malicious mischief endorsement or their equivalents, together with such other insurance coverage as Landlord may deem reasonably applicable in such insurance companies as Landlord shall select and in amounts not less than eighty percent (80%) of the replacement cost of the building and structures insured with loss payable thereunder to Landlord and to any authorized encumbrancer of Landlord (with standard mortgagee loss payable clause) in accordance with their respective interests. Landlord may, at its option, maintain rent insurance for the benefit of Landlord equal to at least one year's rent hereunder. If this Lease is terminated as a result of damage by fire or casualty as set forth in Section 23 hereof, all insurance proceeds shall be paid to and retained by Landlord, subject to the rights of any authorized encumbrancer of Landlord. Tenant shall reimburse Landlord, within fifteen (15) days of date of billing therefor, for Tenant's share of the insurance carried hereunder. Tenant shall further pay to Landlord the entire amount of the increase, if any, in insurance rates, which is caused in whole or in part by Tenant's use of the Leased Premises, over the lowest rate obtainable by Landlord within the Shopping Center. As used in this Section 20.A. Tenant's share shall mean the fraction in which the numerator is the number of square feet of floor area in the Leased Premises and the denominator is the total square feet of floor area, excluding mezzanines, in all buildings, whether leased or leaseable, which is evidenced by, or included within, the policy or policies of insurance referenced herein, which include the Leased Premises. Landlord shall

Landlord's Initials _WⁿJL_

Tenant's Initials _CP DG_

121179                                                    6

have the right to collect and impound the estimated amount of Tenant's share of the insurance maintained pursuant hereto and, in such event, Tenant shall pay the same on a monthly basis, in advance, for Tenant's account based upon Landlord's reasonable estimate of the monthly amount of Tenant's share thereof and Tenant shall pay to Landlord such impounds upon the basis and at the times hereinbefore described for the payment of rent. Landlord shall not be required to separate amounts so impounded from impounds of its other tenants in the Shopping Center, so Landlord be required to pay any interest on such impounds. If the foregoing method of impounds is elected by Landlord, at the end of each calendar year (or fiscal year elected by Landlord) the actual costs shall be reported by Landlord to Tenant. If Tenant's share of the actual costs for any such year exceeds the amount paid by Tenant to Landlord, Tenant shall promptly reimburse Landlord for the amount of excess; provided, however, if Tenant's share for any such year is less than said amount, Landlord shall promptly refund the difference to Tenant, without liability for interest therefor. At the end of each such year, the monthly payment to be made by Tenant shall be adjusted so that the monthly payments for the next year will be equal to an amount reasonably estimated by Landlord to be one-twelfth (1/12) of Tenant's annual share of such insurance, as aforesaid.

B.  Liability Insurance. Tenant shall, at its cost and expense, at all times during the term of this Lease, maintain and carry for the joint benefit, and in the names, of Tenant and Landlord, as co-insureds, with cross liability endorsement, property damage and personal liability insurance by the terms of which Tenant and Landlord shall be indemnified against liability for damage or injury to property or person (including death) occurring on the Leased Premises, or any part thereof, or arising from the use or occupancy thereof, or arising directly or indirectly from any act or omission of Tenant, its employees, agents, representatives, assigns or licensees. Such insurance policy insured(s) and shall be carried and maintained by Tenant on the minimum basis of One Million and 00/100 Dollars ($1,000,000.00) Combined Single Limit for bodily injury (including death) and property damage, and Tenant shall deliver to Landlord the certificate of each insurance carrier as to each such insurance policy prior to commencement of the term hereof, and thereafter at least thirty (30) days prior to the expiration of any such policy. In the event the terms of this Lease shall permit the sale of alcoholic beverages from or on the Leased Premises, such insurance as carried by Tenant hereunder shall include dram shop liability insurance. It is further agreed that Tenant shall, at its cost and expense, at all times during the term of this Lease, maintain and carry plate glass insurance with respect to all plate glass, windows and glazing, of that portion of the building and improvements within which the Leased Premises are contained, in an amount equal to the replacement cost thereof, such insurance to otherwise comply, and be subject to, the requirements and standards of that as set forth herein with respect to liability insurance to be carried by Tenant.  The limits of all such insurance carried by Tenant hereunder shall be increased, at Landlord's option, upon the expiration of twenty-four (24) calendar months after the commencement of the term hereof, and upon the expiration of each twenty-four (24) calendar month period thereafter, in proportion to the increase in the Consumer Price Index as is set forth in Section 4.C. hereof with respect to adjustment of the Fixed Minimum Rent. In the event Tenant fails at any time during the term of this Lease to obtain insurance required to be carried by Tenant hereunder or to provide to Landlord such evidence thereof, Landlord may, but shall not be required, in addition to all other rights and remedies of Landlord hereof, procure such insurance, in which event Tenant shall pay to Landlord, upon demand, the cost and expense thereof, together with interest thereon at the maximum rate permitted by law. All insurance carried by Tenant shall be issued as a primary policy by an insurance company authorized to do business in the state in which the Leased Premises are located with a Best's minimum policy-holder rating of "A" status or better and a Best's financial category minimum rating of Class XI status or better as rated in the most recent edition of Best's Insurance Reports, or as otherwise approved by Landlord.

C.  Notice. Each insurance policy shall contain a clause that it cannot be cancelled or reduced in scope without thirty (30) days' prior written notice to Landlord and to any mortgagee or trust deed holder of whom the insurer has been notified in writing.

D.  Hold Harmless and Waiver of Claims. Tenant covenants and agrees that neither Landlord nor its agents, servants or employees, shall at any time or to any extent whatsoever be liable, responsible or in anywise accountable for any loss, injury, death or damage to person(s) or property which at any time may be suffered or sustained by Tenant or by any person(s) whomsoever who may at any time be using or occupying or visiting the Leased Premises or be in, on or about the same, or the sidewalks or land adjacent thereto or who may be injured as a result of any act, omission or negligence whether arising from the sale of alcoholic beverages, cr otherwise, whether or not such loss, injury, death or damage shall be caused by or in any manner result from or arise out of any act, omission or negligence of Tenant or of any occupant, subtenant, agent, assignee, employee, visitor, invitee or user of any portion of the Leased Premises, or from the use or occupancy of the Leased Premises, or arising from any breach or default of Tenant hereunder, and Tenant shall and herewith does forever indemnify, defend, hold and save Landlord, it agents, servants and employees free and harmless of, from and against any and all claims, liability, loss, cost, expense or damage whatsoever, including, but not by way of limitation, attorneys' fees, on account of any loss, injury, death, or damage occurring on, in , or about the Leased Premises, or arising from the use or occupancy of the Leased Premises, or the violation of any law, rule, ordinance, or regulation thereon.

E.  Waiver of Subrogation. With respect to loss or damage resulting from any cause insured against by the insurance to be carried by Landlord pursuant to the terms of Section 20.A. hereof, and with respect to any similar insurance of the type referenced in said Section 20.A. which is maintained by Tenant, the parties hereto waive any and all rights of recovery against the other, and each such party hereby agrees that it shall not make any claim against the other, or seek to recover from the other, for loss of or damage to the other, or its property, or property of others under its control, and each party hereto shall give notice to any insurance carrier of the foregoing waiver of subrogation, and obtains from such carrier a waiver of right to recovery against the other party hereto, its agents and employees. In furtherance of the foregoing, Tenant agrees that in the event of a sale of the Leased Premises by Landlord, the hereinabove waiver of subrogation shall continue in favor of the original Landlord hereunder, and any subsequent landlord, as well as be in favor of any such purchaser, and their respective successors and assigns.

## Section 21.  Repairs, Maintenance, Alterations and Removal of Equipment

A.  At all times Tenant shall keep the Leased Premises and the interior of the building and improvements within which the same are located, the walkways adjacent to the Leased Premises, and any loading platforms and service areas allocated for the use of Tenant, whether or not such use be exclusive, clean and free from rubbish, dirt, snow and ice. Tenant shall maintain in good order and condition and otherwise repair and replace as and when necessary, all show windows, plate glass, and show cases comprising a part of the Leased Premises or within which the Leased Premises are contained. Tenant shall not place any rubbish or other matter outside any building within the Shopping Center, except in such containers as are authorized from time to time by Landlord. Except as specifically provided in this Section 21, and in Section 24 (Condemnation) and Section 23 (Fire and Casualty Damage), Landlord shall not be obligated to repair, replace, maintain or alter the Leased Premises, or the building or improvements within which the same are located, and Tenant waives all laws in contravention thereof. With regard to repairs, Tenant expressly waives any right pursuant to any law now existing, or which may be effective during the term hereof, to make repairs at Landlord's expense, including, without limitation, should the Shopping Center be located in the State of California, the provisions of Sections 1932(2), 1933(4), 1941 and 1942 of the California Civil Code, and any provisions amendatory thereof or supplemental thereto.

Landlord's Initials _____

Tenant's Initials _____

121779                                          7

B. Tenant shall not have the right to make any additions, alterations, changes or improvements to the Leased Premises unless Landlord, in its discretion, has approved the same in advance and in writing. No additions, alteration, change or improvement shall be made which will weaken the structural strength, lessen the value of or change the architectural appearance or elevation of any building or other construction. All alterations, additions, and improvements made or installed by Tenant to or upon the Leased Premises and the building within which the same are located, except signs, cases, counters or other removable trade fixtures, shall at once when made or installed be deemed to have attached to the freehold and to have become the property of Landlord.

C. Landlord reserves the right, at any time and from time to time throughout the term of this Lease, to let or make agreement(s) or contract(s) and/or to otherwise arrange for, or perform, the maintenance, repair and operation (or any combination thereof) of: (a) the heating and ventilating system, electrical, plumbing, pipes, wiring, conduit, sprinkler system (if any), and air conditioning apparatus of the building serving the Leased Premises, (b) the roof of the building serving the Leased Premises, (c) the exterior of the building within which the Leased Premises are located, including, without limitation, the painting thereof, and (d) the structural portions of the building within which the Leased Premises are located, or any of the foregoing or any combination thereof, in which such event, Tenant shall promptly pay to Landlord, within fifteen (15) days of billing thereof, Tenant's share of the cost of any such maintenance, repair or operation, as aforesaid, plus a management fee to Landlord equal to fifteen percent (15%) of the cost of the foregoing, which share shall be apportioned according to the floor area of the Leased Premises as it relates to the total floor area of the building or buildings which are so maintained, repaired or operated, as aforesaid, provided, however, in the case of a maintenance contract for any of the foregoing, payment of Tenant's share shall be made in advance in the amount designated by Landlord, from time to time, on the first day of every month during the term hereof. Any portion of the foregoing to the contrary notwithstanding, in the event any such maintenance, repair or operation, as aforesaid, is attributable to the negligent act or omission of Tenant, or to any violation by Tenant of any provision of this Lease, Tenant shall pay to Landlord, as aforesaid, an amount equal to the cost of any such maintenance, repair, or operation so attributable to the act or omission of Tenant. Landlord may make such repairs and perform such maintenance and operation without liability to Tenant for any loss or damage that may accrue to Tenant's merchandise, fixtures, or other property, or to Tenant's business by reason thereof, unless due to the ~~willful misconduct of~~ negligence Landlord, or its agents.

## Section 22.  Mechanic's Liens

A. Tenant agrees to keep all of the Leased Premises and every part thereof and all buildings and other improvements within which the same are located free and clear of and from any and all mechanic's, materialmen's and other liens for work or labor done, services performed, materials, appliances, transportation or power contributed, used or furnished to be used in or about the Leased Premises to or be based within ten (10) days after learning of the existence thereof and Tenant shall save and hold Landlord and all of the Leased Premises and all buildings and improvements within which the same are contained free and harmless of and from any and all such liens and claims of liens and suits or other proceedings arising out of materials or services furnished to or on the order of Tenant. Tenant agrees to give Landlord written notice not less than ten (10) days in advance of the commencement of any construction, alteration, addition, improvement, installation, or repair costing in excess of Five Hundred and 00/100 Dollars ($500.00) in order that Landlord may post appropriate notices of Landlord's non-responsibility, and, further, to secure, at Tenant's sole cost and expense, a bond indemnifying and releasing Landlord and the Leased Premises from the effect of all aforesaid liens, with corporate surety, and in form, satisfactory to Landlord.

B. No mechanic's or materialmen's liens or mortgages, deeds of trust, or other liens of any character whatsoever created or suffered by Tenant shall in any way, or to any extent, affect the interest or rights of Landlord in any buildings or other improvements on or about the Leased Premises, or attach to or affect Landlord's title to or rights in the Leased Premises.

## Section 23.  Fire and Casualty Damage

If the Leased Premises shall be damaged by fire or casualty but are not thereby rendered untenable in whole or in part, Landlord shall have the option to cause such damage to be repaired from the insurance proceeds paid pursuant to such damage, and the rent shall not be abated. If by reason of such occurrence or occurrences the Leased Premises shall be rendered untenable either in whole or in part, Landlord likewise shall have the option to cause the damage to be repaired, in which case the Fixed Minimum Rent provided hereunder shall be abated proportionably as to the portion of the Leased Premises rendered untenable; provided, however, there shall be no such abatement to the extent that Landlord is paid the proceeds of the rent insurance maintained pursuant to the terms of Section 20.A. hereof. Landlord may, however, in any of the above events and at its election, terminate this Lease by giving Tenant written notice of Landlord's election within sixty (60) days following the date of the occurrence, and in such event the Lease shall terminate on the date of such notice and rent shall be prorated as of the date of such notice. In no event shall Landlord be liable to make repairs costing in excess of the insurance proceeds paid to Landlord as a result of the damage or destruction.

## Section 24.  Condemnation

A. General. If title to all or any portion of the Leased Premises be taken by a public or quasi-public authority under any statute or by right of eminent domain or by private purchase in lieu thereof, then the rights of the parties to share in the condemnation award or purchase price thereby resulting shall be governed hereby.

B. Total or Material Taking. Should all or any portion of the Leased Premises be taken in such a manner as to materially interfere with Tenant's use and occupancy thereof, then either party, by giving written notice to the other party within thirty (30) days after such taking, may terminate this Lease as of the date of such notice, or should any tenant or occupant occupying more than 10,000 square feet of building area in the Shopping Center cancel its lease or abandon its premises by reason of any such taking or damage, or should more than fifty percent (50%) of the area of land described in Exhibit "A" hereto be so taken, or should more than twenty percent (20%) of the Leased Premises be so taken, then Landlord, by giving written notice to Tenant within sixty (60) days after such taking, may terminate this Lease as of the date of such notice. In the event of any such taking, Landlord shall be entitled to any and all awards and payments except Tenant shall be entitled to only that portion of any award allocated to the taking of Tenant's fixtures and personal property. None of the awards or payments to Landlord shall be subject to any diminution or apportionment on behalf of Tenant or otherwise.

C. Partial Taking. In the event of a partial taking of the Leased Premises, and the Lease is not cancelled, then this Lease as to the part so taken only shall terminate as of the date that possession of such part of the Leased Premises be so taken, and the Fixed Minimum Rent herein provided for shall be reduced in the proportion that the square footage of the ground floor of building area of the Leased Premises so taken bears to the total building floor area of the Leased Premises existing before such taking. Landlord shall diligently replace or repair the building within which the Leased Premises are located but at a cost to Landlord not to exceed the condemnation award received by Landlord for such repairs. In the event of such partial taking Landlord shall be entitled to any and all awards and

Landlord's Initials _WJC_

Tenant's Initials _____

payments except Tenant shall be entitled to only that portion of any award allocated to the taking of Tenant's fixtures and personal property. None of the awards or payments shall be subject to any diminution or apportionment on behalf of Tenant or otherwise.

## Section 25.   Default

If Tenant shall default in the payment of any rent or charge or sum of money due, or to be paid by Tenant hereunder, and such default shall continue for a period of five (5) days after written notice thereof from Landlord, or if Tenant shall conduct, or permit any act of waste or nuisance on or with respect to the Leased Premises or any portion thereof, and the same shall not be corrected within five (5) days after written notice thereof from Landlord, or if Tenant shall default in the performance or observance of any other term, covenant, agreement or obligation of this Lease to be performed or observed by Tenant, and such default shall continue for a period of ten (10) days after written notice thereof by Landlord, or if more than two (2) of any of the foregoing defaults, or any combination thereof, shall occur in any single twelve (12) month period during the term hereof, whether or not the same be timely cured, or if Tenant shall vacate or abandon the Leased Premises, then Landlord shall have, in addition to any other remedies available at law, without further notice to Tenant, and without barring later election of any other remedy, any one or more of the following remedies at Landlord's election:

A.  Landlord may require strict performance of all the terms, covenants, agreements and obligations hereof as the same shall accrue, and have the right of action therefor; or

B.  By written notice to Tenant, Landlord may terminate this Lease, re-enter the Leased Premises by process of law, remove all parties in possession thereof therefrom and repossess said Leased Premises, in which event, Landlord shall have the right to recover from Tenant: (1) the worth, at the time of the award of the unpaid rent that had been earned at the time of termination of this Lease; (2) the worth, at the time of the award, of the amount by which the unpaid rent that would have been earned after the date of termination of this Lease until the time of award exceeds the amount of loss of rent that Tenant proves could have been reasonably avoided; (3) the worth, at the time of the award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of the loss of rent that Tenant proves could have been reasonably avoided; and (4) any other amount, and court costs, necessary to compensate Landlord for all detriment proximately caused by Tenant's default. "The worth, at the time of the award," as used in (1) and (2) of this Subparagraph B. is to be computed by allowing interest at the rate of ten percent (10%) per annum, or the maximum lawful rate, whichever is the lesser; "the worth, at the time of the award," as referred to in (3) of this Subparagraph B. is to be computed by discounting the amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award, plus one percent (1%), or the maximum lawful rate, whichever is the lesser.

All rights and remedies of Landlord herein enumerated shall be cumulative and none shall exclude any other right or remedy allowed by law, or equity; and likewise, the exercise by Landlord of any remedy provided for herein or allowed by law or equity shall not be to the exclusion of any other remedy.

Landlord and Tenant further agree that in the event Tenant breaches this Lease, or any covenant, term, or condition hereunder, and abandons the Leased Premises, or any portion thereof, this Lease shall continue in force and effect for so long as Landlord does not terminate Tenant's right to possession, as set forth in this Lease, and Landlord may enforce all rights and remedies of Landlord including, without limitation, the right to recover rental as it becomes due hereunder. Acts of maintenance or preservation, or efforts to relet the Leased Premises, or the appointment of a receiver upon the initiation of the Landlord to protect the Landlord's interests under this Lease shall not constitute a termination of Tenant's right to possession.

Any re-entry shall be allowed by Tenant without let or hindrance, and Landlord shall not be liable in damages for any such re-entry, or be guilty of trespass or forcible entry. No act by Landlord hereunder shall terminate this Lease unless Landlord notifies Tenant in writing that Landlord elects to terminate this Lease.

It is further agreed that Landlord, at any time after Tenant commits a default, may cure the default at Tenant's cost, and otherwise take such action with respect thereto as Landlord shall deem reasonably necessary and Landlord shall have no liability therefor. If Landlord at any time, by reason of Tenant's default, pays any sum or does any act that requires the payment of any sum, or if Landlord incurs any expense, including attorneys' fees, in instituting proceedings, or defending any action or proceeding instituted by reason of any default of Tenant hereunder, the sum or expense paid by Landlord, with all interest, costs, and damages, shall be due immediately from Tenant to Landlord at the time the same is paid, and if not so immediately paid by Tenant, shall bear interest as hereinafter provided.

Any sums to be paid to Landlord under this Lease not paid when due shall bear interest at the rate of ten percent (10%) per annum from the date due until paid; provided, however, in no event shall any amount in excess of the maximum lawful rate of interest ever be charged or payable hereunder.

## Section 26.   Surrender of Premises

A.  Upon any termination of this Lease, whether by lapse of time, cancellation pursuant to an election provided for herein, forfeiture, or otherwise, Tenant shall surrender immediately possession of the Leased Premises and all buildings and improvements within which the same are located to Landlord in good and tenantable repair, reasonable wear and tear and damage from fire or other casualty or peril excepted.

B.  At any time during the term of this Lease, and upon the termination of this Lease, Tenant, if Tenant is at such time not in default hereunder, shall have the right to remove from the Leased Premises all furniture, furnishings, signs and equipment belonging to Tenant then installed or in place in, on or about the Leased Premises; provided, however, Tenant shall, and it covenants and agrees to, make all repairs to the Leased Premises required because of such removal. If any of such property shall remain on the Leased Premises after the end of the term hereof, such property shall be and become, at the option of Landlord, the property of Landlord without any claim therein of Tenant; provided that Landlord may direct Tenant to remove such property, in which case Tenant agrees to do so, and to reimburse Landlord for any expense of removal in the event Tenant shall fail to remove such property if and when directed.

C.  Upon termination of this Lease, Tenant shall surrender the Leased Premises in a neat and clean condition, and Tenant shall repair any holes or openings made by Tenant in the walls, roof or floor of the building, remove any protuberance and perform any maintenance or repairs required of Tenant by this Lease. If directed so to do by Landlord, Tenant shall also remove any improvements, additions or alterations made to the Leased Premises by Tenant even though such improvements by the terms of this Lease become a part of the Leased Premises.

D.  Upon termination of this Lease, Tenant shall execute a quitclaim deed, quitclaiming all of its right, title and interest in and to the Leased Premises to Landlord.

E.  This Lease shall terminate and shall become null and void without further notice upon the expiration of the term herein specified, and any holding over by Tenant after such expiration shall not constitute a renewal hereof or give Tenant any rights under this Lease. If Tenant shall hold over for any period after the expiration of said term, Landlord may, at its option, exercised by written notice to Tenant, treat Tenant as a Tenant from month to month commencing on the first day following the expiration of this Lease, subject to the

Landlord's Initials

Tenant's Initials

terms and conditions herein contained except that the Fixed Minimum Rent, which shall be payable in advance monthly, shall be one hundred fifty percent (150%) of said Fixed Minimum Rent applicable at the date of expiration. If Tenant fails to surrender the Leased Premises upon the expiration of this Lease, Tenant shall indemnify and hold Landlord harmless from all loss or liability, including without limitation, any claims made by any succeeding tenant founded on or resulting from such failure to surrender.

## Section 27.  Force Majeure

Prosecution of any construction, repairs or rebuilding any building, improvement or other structure herein shall be excused to the extent that the delay is occasioned by the other party, strikes, threats of strikes, blackouts, war, threats of war, bombing, insurrection, invasion, acts of God, calamities, civil commotions, violent action of the elements, fire, action or regulations of any governmental authority, state, law or ordinances, impossibility of obtaining materials, or other matters or things, whether similar or dissimilar to the foregoing, beyond the reasonable control of the obligated party.

## Section 28.  Offset Statements

A. Tenant agrees at any time upon not less than ten (10) days' prior written request of Landlord, to execute, acknowledge and deliver to Landlord a statement in writing in the form attached as Exhibit "E" hereto, certifying that this Lease is unmodified and in full force and effect and Landlord is not in default (or if modified, in full force and effect as modified and stating modifications, or if there is any default stating such default), the dates to which rental or other sums have been paid in advance, and setting forth such further information with respect to this Lease or the Leased Premises as may be requested thereon, it being intended that any such statement delivered pursuant to this Section 28 may be relied upon by any prospective purchaser, mortgagee, assignee, or beneficiary. Tenant shall also deliver to any prospective institutional lender of Landlord within fifteen (15) days of Landlord's request therefor, from time to time, Tenant's latest financial statements and such specific subordination agreement on lender's form as may be required by such lender.

B. Tenant's failure to deliver such statement within such time shall be conclusive upon Tenant (i) that this Lease is in full force and effect, without modification except as may be represented by Landlord, (ii) that there are no uncured defaults in Landlord's performance of Landlord's obligations hereunder, (iii) that not more than one month's rent has been paid in advance, and (iv) that any other information with respect to this Lease or the Leased Premises requested to be confirmed therein is true and correct, and any such failure may be considered by Landlord as a default of Tenant under this Lease. It is further agreed that Tenant shall be liable to Landlord, and shall indemnify Landlord from and against, any loss, cost, damage or expense, incidental, consequential, or otherwise, arising or accruing directly or indirectly, out of any failure of Tenant to deliver to Landlord any statement in the time and manner required pursuant to this Section 28.

## Section 29.  Rights Reserved by Landlord

A. Easements. Landlord expressly reserves all rights in and with respect to the Leased Premises not inconsistent with Tenant's use thereof as in this Lease provided.

B. Inspection.

(1) Tenant agrees to permit Landlord or the authorized representatives of Landlord to enter the Leased Premises at all reasonable times during usual business hours for the purposes of (a) inspecting same, and (b) making such repairs or reconstruction required or permitted by Landlord, and (c) performing any work therein that may be necessary by reason of Tenant's default under the terms of this Lease, without prior written notice thereof to Tenant. Nothing herein shall imply any duty upon the part of Landlord to do any such work which, under the provisions of this Lease, Tenant may be required to perform, and the performance thereof by Landlord shall not constitute a waiver of Tenant's default in failing to perform the same. In the event Landlord makes any repairs or maintenance which Tenant has failed to do, the cost thereof shall be paid to Landlord with the next installment of rental hereunder.

(2) Landlord is hereby given the right during usual business hours to enter the Leased Premises and to exhibit the same for purposes of sale, lease, or mortgage, and during the last six (6) months of the term of this Lease, to exhibit the same to any prospective tenant, and to post any signs on or about the Leased Premises regarding such sale, lease or mortgage.

C. Accord and Satisfaction. No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in this lease provided.

## Section 30.  Utility Rationing

Tenant acknowledges that the Leased Premises may become subject to the rationing of utility services, or restrictions on use. Notwithstanding any such rationing or restrictions on use of any such utility services, Tenant acknowledges and agrees that its tenancy and occupancy hereunder shall be subject to such rationing restrictions as are now or which may be imposed upon Landlord, Tenant, the Leased Premises or the Shopping Center, and Tenant shall in no event be excused or relieved from any covenant or obligation to be kept or performed by Tenant by reason of any such rationing or restrictions. Tenant further agrees to pay and discharge, prior to delinquency, any amount, tax, charge, surcharge, assessment, or imposition levied, assessed or imposed upon the Leased Premises, or Tenant's use and occupancy thereof, or the utility services therein, or the delivery or use thereof, or as a result, whether directly or indirectly, of any such rationing or restrictions.

## Section 31. Merchants' Association

A. If a Majority of tenants in the Shopping Center shall determine that it is in the best interests of the Shopping Center, Tenant will become a member of, and participate fully in, and remain in good standing in the Merchants' Association (as soon as the same has been formed), organized for tenants occupying premises in the Shopping Center, and Tenant will abide by the regulations of such Association. Each member tenant shall have one (1) vote, and the Landlord shall also have one (1) vote, in the operation of said Association. The objects of such Association shall be to encourage its members to deal fairly and courteously with their customers, to encourage ethical business practices, and to assist the business of the tenants by sales promotion and centerwide advertising. The Tenant agrees to pay minimum dues to the Merchants' Association, provided however, that in no event shall the dues paid by Tenant in any fiscal year of said Association be in excess of twenty (20¢) cents per square foot of Premises leased to Tenant. Default in payment of dues shall be treated in similar manner to default in rent with like rights of Landlord at its option to the collection thereof on behalf of the Merchants' Association.

## Section 32.  Miscellaneous

A. Loss and Damage. Landlord shall not be liable for any damage to property of Tenant or of others located on the Leased Premises, nor for the loss of or damage to any property of Tenant or of others by theft or otherwise. Landlord shall not be liable for any injury or

121779                                   10

Landlord's Initials _____

Tenant's Initials _____

damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water, rain or leaks from any part of the Leased Premises or from the pipes, appliances or plumbing works or from the roof, street or subsurface or from any other place or by dampness or by any other cause of whatsoever nature. Landlord shall not be liable for any such damage caused by other tenants or persons in the Leased Premises, occupants of adjacent property, of the Shopping Center, or the public, or caused by operations in construction of any private, public or quasi-public work. Landlord shall not be liable for any latent defect in the Leased Premises or in the building of which they form a part. All property of Tenant kept or stored on the Leased Premises shall be so kept or stored at the risk of Tenant.

B. Lease Binding on Successors. The terms, covenants and agreements herein contained shall bind and inure to the benefit of Landlord and Tenant, and each of their heirs, personal representatives, successors and assigns, subject to the provisions of this Lease. No rights, however, shall inure to the benefit of any assignee of Tenant unless the assignment to such assignee has been approved by Landlord as set forth in Section 13 hereof.

C. Attorneys' Fees. In the event that legal proceedings are brought or commenced to enforce the terms of this Lease, the prevailing party shall be entitled to recover from the other party all costs and expenses of such proceedings, including reasonable attorneys' fees, whether or not any proceedings are prosecuted to judgment.

D. Sale of Leased Premises. The term "Landlord" as used in this Lease shall mean the owner of Landlord's estate in and to the Leased Premises. If the Landlord's interest and estate in and to the Leased Premises is sold or assigned by Landlord, the seller shall be entirely freed, relieved, and discharged of all covenants, agreements, and obligations under this Lease, except those occurring prior to the date of such sale by Landlord, and attributable to Landlord's period of ownership of such interest and estate.

E. Corporate Resolutions. If a Corporation executes this Lease as Tenant, Tenant shall, concurrently upon such execution of the Lease, furnish Landlord with certified corporate resolutions attesting to the authority of the officers so executing the Lease to execute the same on behalf of such corporation.

F. Notices. Any notice or demand required or permitted by law or by any of the provisions of this Lease shall be in writing. All notices or demands by Landlord to Tenant shall be deemed to have been properly given when served personally on an executive officer or partner of Tenant or on the individual comprising Tenant (as the case may be) or when sent by registered or certified mail, postage prepaid, addressed to Tenant at the address of the Leased Premises, or at the address set forth in the Fundamental Lease Provisions. All notices or demands by Tenant to Landlord shall be deemed to have been properly given if served personally on an executive officer of Landlord, or when sent by registered or certified mail, postage prepaid, addressed to Landlord at the address set forth in the Fundamental Lease Provisions. Either party hereto may change the place to which notices are to be given by advising the other party in writing. If any notice or other document is sent by mail, as aforesaid, the same shall be deemed served or delivered forty-eight (48) hours after the mailing thereof, provided there is regular service by mail, at the time of such mailing, between the place of mailing and the place to which such notice or other document is mailed. If more than one Tenant is named under this Lease, service of any notice upon any one of said Tenants shall be deemed as service upon all of said Tenants.

G. Section Headings. The headings or captions of Sections in this Lease are for convenience and reference only, and they in no way define, limit, or describe the scope or intent of this Lease or the provisions of such Sections.

H. Gender and Interpretation of Terms and Provisions. As used in this Lease and whenever required by the context thereof, each number, both singular or plural, shall include all numbers, and each gender shall include all genders. Landlord and Tenant as used in this Lease or in any other instrument referred to in or made a part of this Lease shall likewise include both the singular and the plural, a corporation, co-partnership, individual or person acting in any fiduciary capacity as executor, administrator, trustee, or in any other representative capacity. All covenants herein contained on the part of Tenant shall be joint and several.

I. Time of Essence. Time is hereby expressly declared to be of the essence of this Lease and of each and every covenant, term, condition, and provision hereof.

J. Impartial Construction. The language in all parts of this Lease shall be in all cases construed as a whole according to its fair meaning and not strictly for nor against either Landlord or Tenant.

K. Waiver. No waiver of any breach of the terms, covenants, agreements, restrictions or conditions of this Lease shall be construed as a waiver of any succeeding breach of the same or other covenants, agreements, restrictions or conditions of this Lease, nor shall consent to any assignment or sublease be deemed to waive any requirement of consent of Landlord to any other assignment or sublease. The consent or approval of either party to or of any act or matter requiring consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any subsequent or similar act or matter.

L. Partial Invalidity. If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term, covenant, or condition of this Lease shall be valid and be enforced to the fullest extent permitted by law. It is agreed, however, that anything contained in the preceding sentence to the contrary notwithstanding, in the event any court of competent jurisdiction makes a final adjudication to the effect that any portion of this Lease is invalid under the laws of the state within which the Leased Premises are located, or any other applicable law, then in that event, Landlord shall have the right and option to terminate the entire Lease upon notice thereof to Tenant.

M. Remainder of Shopping Center. Tenant acknowledges and agrees that it shall have no right of control, regulation, approval or disapproval with respect to the use or development of that portion of the Shopping Center which is not included within the Leased Premises. It is understood by Tenant that Landlord may not now or in the future own all of the Shopping Center in which the Leased Premises are located. Tenant agrees not to cancel its Lease, reduce or abate its rents or pursue any other remedies under this Lease for any violation of this Lease occurring by virtue of any act or omission on or with respect to property not owned by Landlord.

N. Tenant's Acknowledgement of Condition of Leased Premises. Tenant agrees that its acceptance of the Leased Premises evidenced by Tenant's entry into possession thereof shall constitute unqualified proof that the Leased Premises are, as of the date of the commencement of Tenant's occupancy thereof, in a tenantable and good condition; that Tenant will take good care thereof, and Tenant hereby waives all rights to make repairs at Landlord's expense. In respect to any partial destruction which Landlord may repair under any of the provisions of this Lease, Tenant further waives any rights which may permit Tenant to terminate this Lease for so long as Landlord so repairs such destruction.

O. No Option to Lease. The submission of this Lease for examination does not constitute a reservation of or option for the Leased Premises, and this Lease becomes effective as a Lease only upon execution and delivery thereof by Landlord and Tenant.

P. Waiver of Liability. Anything in this Lease to the contrary notwithstanding, Tenant agrees that it shall look solely to the estate and property of the Landlord in the land and buildings comprising the Shopping Center and/or building within which the Leased Premises are located, and subject to prior rights of any mortgagee of the premises, for the collection of any judgment (or other judicial process) requiring the payment of money by Landlord in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed and/or performed by Landlord, and no other assets of the Landlord shall be subject to levy, execution or other procedures for the satisfaction of Tenant's remedies.

Landlord's Initials

Tenant's Initials

Q. **Rights of Lenders.** Notwithstanding anything to the contrary in this Lease, Landlord shall not be in default under any provision of this Lease unless written notice specifying such default is given to Landlord and to all mortgagees and/or trust deed holders of which Tenant, prior to such notice, has been notified in writing. Tenant agrees that any such mortgagee or trust deed holder shall have the right to cure such default on behalf of Landlord within thirty (30) calendar days after receipt of such notice, plus such additional time as is reasonably necessary. Tenant further agrees not to invoke any of its remedies under this Lease until said thirty (30) days have elapsed, or during any period that such mortgagee or trust deed holder is proceeding to cure such default with due diligence, or is taking steps with due diligence to obtain the legal right to enter the Leased Premises or adjoining property to cure the default.

R. **Waiver of Jury Trial and Counterclaims.** The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Leased Premises, and/or any claim of injury or damage. In the event Landlord commences any proceedings for nonpayment of rent, or any other sums or amounts due hereunder, Tenant will not interpose any counterclaim of whatever nature or description in any such proceedings; provided, however, that nothing contained herein shall be deemed or construed as a waiver of the Tenant's right to assert such claims in any separate action or actions brought by Tenant.

S. **Brokers.** Except as may be expressly set forth to the contrary in the Fundamental Lease Provisions, each party represents to the other that no person, firm, corporation or other entity is entitled to any brokerage commission or finder's fee on account of the execution, delivery, and consummation of this Lease. Tenant hereby agrees to indemnify Landlord and to hold Landlord free and harmless of and from any and all claims, losses, damages, costs and expenses of whatsoever nature, including attorneys' fees and costs of litigation arising from or relating to any brokerage commissions or finder's fees incurred by Tenant in connection with this Lease.

T. **AGREEMENTS IN WRITING. IT IS UNDERSTOOD THAT THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES HERETO AFFECTING THIS LEASE AND THIS LEASE SUPERSEDES AND CANCELS ANY AND ALL PREVIOUS NEGOTIATIONS, ARRANGEMENTS, BROCHURES, AGREEMENTS AND UNDERSTANDINGS, IF ANY, BETWEEN THE PARTIES HERETO OR DISPLAYED BY LANDLORD TO TENANT WITH RESPECT TO THE SUBJECT MATTER THEREOF, AND NONE SHALL BE USED TO INTERPRET OR CONSTRUE THIS LEASE. IT IS FURTHER AGREED BY AND BETWEEN THE PARTIES HERETO THAT THERE SHALL BE NO MODIFICATION OR AMENDMENT OF THIS LEASE, EXCEPT AS MAY BE EXECUTED IN WRITING BETWEEN THE PARTIES HERETO. LANDLORD MAKES NO WARRANTY, REPRESENTATION, CONTRACT, AGREEMENT, OR STATEMENT CONCERNING THE USE, OCCUPANCY, OR SUITABILITY OF THE LEASED PREMISES FOR THE USE OF THE LEASED PREMISES AS SET FORTH IN THE FUNDAMENTAL LEASE PROVISIONS, OR WITH RESPECT TO THE CONDITION OF TITLE WITH RESPECT THERETO, OR THE MEANS, MODE, OR MANNER OF CONSTRUCTION OF ANY BUILDINGS OR IMPROVEMENTS, OR THE ADEQUACY OR FITNESS THEREOF FOR ANY USE OR OCCUPANCY, OR THE ACCURACY OR VALIDITY OF ANY STATEMENT, REPRESENTATION, WARRANTY, AGREEMENT, OR DOCUMENT BY ANY OTHER PERSON, PARTY, OR ENTITY, UNLESS EXPRESSLY SET FORTH HEREIN AS AN AGREEMENT OF LANDLORD.**

U. **Matters in Existence.** Tenant agrees that this Lease is, and shall be, subject and subordinate to all matters in existence, whether of record or otherwise, and as now or hereafter modified or amended (provided that the rights of Tenant are not materially adversely affected by such modification or amendment), and further agrees to be bound by and not to violate or cause Landlord to be in violation of any of the provisions of said matters and the provisions contained therein or in any present or future modification or amendment thereof.

V. **Law Governing.** The laws of the state wherein the Leased Premises are located shall govern the validity, performance and enforcement of this Lease.

W. **WARRANTIES OF TENANT. TENANT WARRANTS AND REPRESENTS TO LANDLORD, FOR THE EXPRESS BENEFIT OF LANDLORD, THAT: (a) TENANT HAS UNDERTAKEN A COMPLETE AND INDEPENDENT EVALUATION OF THE RISKS INHERENT IN THE EXECUTION OF THIS LEASE AND THE OPERATION OF THE LEASED PREMISES FOR THE USE PERMITTED HEREBY AS SET FORTH IN THE FUNDAMENTAL LEASE PROVISIONS, AND THAT, BASED UPON SAID INDEPENDENT EVALUATION, TENANT HAS ELECTED TO ENTER INTO THIS LEASE AND HEREBY ASSUMES ALL RISKS WITH RESPECT THERETO; (b) NO ORAL OR WRITTEN INDUCEMENT(S) TO EXECUTE THIS LEASE HAVE BEEN MADE TO TENANT UNLESS EXPRESSLY SET FORTH HEREIN IN WRITING; (c) IN ENTERING INTO THIS LEASE, TENANT RELIES UPON NO STATEMENT, FACT, PROMISE, OR REPRESENTATION (WHETHER EXPRESS OR IMPLIED, WRITTEN OR ORAL) NOT SPECIFICALLY SET FORTH HEREIN IN WRITING; (d) ANY STATEMENT, FACT, PROMISE, OR REPRESENTATION (WHETHER EXPRESS OR IMPLIED, WRITTEN OR ORAL) MADE AT ANY TIME WHATSOEVER TO TENANT, WHICH IS NOT EXPRESSLY INCORPORATED HEREIN IN WRITING, IS, AND SHALL FOREVER BE, WAIVED AND RENOUNCED BY TENANT; AND (e) ANY STATEMENT, FACT, PROMISE, OR REPRESENTATION NOT EXPRESSLY CONTAINED HEREIN SHALL IN NO WAY BIND LANDLORD, AND TENANT HEREBY WAIVES ANY RIGHT OF RESCISSION AND ALL CLAIMS FOR DAMAGES BY REASON OF ANY STATEMENT, FACT, PROMISE, OR REPRESENTATION, IF ANY, NOT CONTAINED IN THIS LEASE. THE WARRANTIES AND REPRESENTATIONS OF TENANT HEREIN SHALL BE ENFORCEABLE BY WAY OF SPECIFIC PERFORMANCE OR INJUNCTIVE RELIEF, IN ADDITION TO ANY OTHER REMEDY AT LAW OR EQUITY. ON THE BASIS OF THE FOREGOING WARRANTIES AND REPRESENTATIONS OF TENANT, LANDLORD IS WILLING TO ENTER INTO THIS LEASE. IN THE EVENT ANY OF SUCH WARRANTIES OR REPRESENTATIONS OF TENANT HEREIN CONTAINED SHALL BE INACCURATE OR UNTRUE, LANDLORD MAY, IN ADDITION TO ALL OTHER RIGHTS OF LANDLORD AT LAW OR EQUITY, TERMINATE THIS LEASE AT ANY TIME THEREAFTER UPON WRITTEN NOTICE TO TENANT.**

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and year first above written.

~~CARLTON L. PERRY & DWIGHT W. PERRY d/b/a~~

Crow Canyon Cleaners - a General Partnership by:    CARLTON L. PERRY, Partner
                                                    DWIGHT W. PERRY, Partner

                                                    DUBLIN TOWN of COUNTRY ASSOCIATES

*(signatures)*                              By: *(signature)*

                                            Its: *(signature)*

"Tenant"

12

"Landlord"

## ADDENDUM

THIS ADDENDUM is attached to and made a part of that certain Lease dated April 3, 1985 by and between Dublin Town & Country Associates, Landlord, and Carlton L. Perry and Dwight W. Perry, Tenants, on premises located at 7272 San Ramon Road, Dublin, California.

33. Section 4(C): Consumer Price Index: There shall be no Consumer Price Index increase until the third year of this Lease. The maximum adjustment of the monthly Fixed Minimum Rental per the Consumer Price Index adjustment shall not exceed six percent (6%) per year cumulative over the applicable term of this Lease.

34.
OPTION TO EXTEND TERM. Landlord hereby grants Tenant an option to extend the term (the "initial term") of the Lease, as set forth in Article 1 hereof, for ___Five___ years (the "option period" or "extended term") on all the terms and provisions contained in the Lease, subject to the following terms, conditions and exceptions:

(i) Tenant shall notify Landlord in writing of Tenant's exercise of said option at least four (4) months but no more than six (6) months prior to the expiration of the initial term hereof.

(ii) If Tenant is in default under any of the terms and conditions of the Lease on the date of giving written notice to exercise the foregoing option, such notice shall be null and void and shall have no effect. If Tenant is in default on the commencement date of the option period, the extended term shall not commence and the Lease shall expire at the end of the initial term.

(iii) The minimum annual rental ("Rental") payable by Tenant during the extended term shall be at the most current rental rate per square foot being asked by Landlord for comparable space located in the project as of the date of commencement of the extended term, but in no event shall the Rental during the extended term be less than the Rental in effect during the previous Lease year. The Rental during the extended term shall be increased annually at those rates being quoted by Landlord at the time the option as described herein is exercised.

(iv) On or about the date of commencement of the extended term, Landlord shall give Tenant written notice of the Rental amounts which shall be payable hereunder by Tenant during the extended term, in which notice Landlord shall certify to Tenant the then current rate per square foot being quoted by Landlord for retail space located within the project. Landlord and Tenant shall execute an Amendment to Lease, no later than thirty (30) days after the commencement date of the option period, setting forth the Rental to be paid by Tenant during said option period. Failure of Tenant to execute said Amendment within such time period shall constitute a material default hereunder.

(v) The foregoing option to extend the term of this Lease is personal to Tenant and shall automatically terminate upon any assignment, transfer, hypothecation or encumbrance of this Lease or any sublease of the premises.

35. Exhibit "C" Landlord's Obligations:

2(e) Tenant does not require the two (2) three (3) ton air conditioning unit provided under Landlord's obligation. Landlord shall credit Tenant with the cost of said air conditioning unit and cost of ducting and allow Tenant to install swamp coolers.

1(g) Landlord's obligation is to provide for one 200 amp panel board. Tenant shall pay for the additional cost to provide a 300 amp panel if necessary.


INITIAL

36.  Landlords and Tenants liabilities under this lease are all conditioned
on tenant obtaining all necessary licenses and permits to conduct a dry
cleaning plant business on the premises.

ADDENDUM  II


THIS ADDENDUM is attached to and made a part of that certain Lease dated April 3, 1985 by and between Dublin Town & Country Associates, Landlord, and Carlton L. Perry and Dwight W. Perry, Tenants, on premises located at 7272 San Ramon Road, Dublin, California.

36.  Paragraph 31:  MERCHANT'S ASSOCIATION:  Paragraph 31 shall be deleted from the original lease and shall be replaced by the following paragraph:  SHOPPING CENTER PROMOTIONAL FUND:


Shopping Center Promotional Charge:  Tenant shall pay to Landlord, as additional rent, an annual promotional charge initially equal to the product of the number of square feet of floor area comprising the premises times 40 cents payable in equal monthly installments in advance on the first day of each month during the term of this Lease and any extension thereof, or in such installments as Landlord shall designate in writing, without deduction, offset, or demand, to Landlord or to such person or entity as Landlord shall from time to time designate in writing.  Such promotional charge shall be prorated for any fraction of a month at the commencement or expiration of the term of this Lease. The amounts of the promotional charge payable hereunder by Tenant shall be adjusted on the first day of each calendar year during the term of this Lease and any extension thereof in the same manner as the Base Rent may be adjusted under Paragraph 4c of the Lease.  In no event shall the promotional charge payable by Tenant hereunder be less than the amount stated above.

Landlord at its sole discretion, shall use said promotional charge to conduct an advertising and promotional program for the general purpose of furthering the interests of all Tenants at the shopping center.  Landlord shall not be obligated to expend on promotional or advertising services or events any amounts in excess of promotional charges actually collected from Tenants at the shopping center.


TENANT:            _____
                   Carlton L. Perry

                   _____
                   Dwight W. Perry

LANDLORD:          _____
                   William F. Kartozian

EXHIBIT "A"

LEGAL DESCRIPTION

Parcel 2 of Parcel Map #2806, filed December 29, 1978
in Book #107 of Parcel Maps, page 62, Alameda County
Records.

EXHIBIT "B"

THIS PLOT PLAN AND ALL BUILDINGS
OR IMPROVEMENTS DEPICTED HEREIN
SHALL BE SUBJECT TO MODIFICATION
AT ANY TIME AT THE OWNER'S
DISCRETION.



**PREMISES**

**Plot Plan**



<u>Landlord's Obligations</u>:

1.  Landlord shall provide Tenant with an approximate __1806 sq.ft.__ store space located as shown on Exhibit "B". The store space shall constitute the leased premises as defined in Paragraph 1 of the Lease. Landlord's improvements consist of the following:

    A.  Landlord shall provide a concrete slab floor. (Slab will be poured during normal construction sequence.)

    B.  Landlord shall provide one (1) restroom with toilet, lavatory, light fixture, electrical outlet, ventilation, toilet paper holder; (grab bars only if required by code).

    C.  Landlord shall provide a storefront with one (1) ~~single-acting door~~. double

    D.  Landlord shall provide a suspended 2' x 4' acoustical ceiling with exposed teebars and __two (2)__ row(s) of two (2) tube slimline flourescent light fixtures without diffusers.

    E.  Landlord shall provide heating ~~and a _____ -ton air conditioning system~~. See Addendum

    F.  Landlord shall provide a conduit for telephone service at rear of store above ceiling.

    G.  One (1) __200__ ~~300~~ amp panel board as well as __six (6)__ duplex electrical receptacles on each party wall plus one (1) electrical junction box in the interior attic of the building for Tenant's sign.

    H.  Landlord shall provide walls ready for Tenant's painting or finish, and finished exterior doors. Toilet areas, doors and trim to be painted with two coats enamel.

    I.  Landlord to provide gas service to premises.

    J.  Sprinkler system.

EXHIBIT "C"

Page 1 of 2



**Tenant's Obligations:**

2. **A.** All other improvements which are to be constructed within the leased premises will be provided by the tenant at Tenant's sole cost and expense. Tenant is required to submit plans for all of Tenant's improvements within 14 days of the execution of this Lease and receive approval from Landlord prior to the installation of said improvements.

**B.** Tenant shall pay all fees levied by appropriate governmental jurisdictions which are directly related to Tenant's extra improvements and/or use of the leased premises. Tenant agrees to reimburse Landlord for all architectural/engineering fees in connection with the preparation and/or review of working drawings for Tenant's extra improvements.

**C.** Tenant agrees that all work performed by him or his contractor or agent shall be of a good and workmanlike quality, and performed in a diligent manner so as not to create nuisance to the other tenants of the shopping center in which the premises are located.

**D.** Tenant warrants that his contractors shall in no way delay or cause delay or nuisance to any other contractor working on the shopping center. Tenant agrees to hold Landlord harmless for the cost of any time lost by Landlord's contractor due to the actions or failure to act of Tenant's contractors.

**E.** In the event Tenant elects to use a contractor other than Landlord's contractor, prior to construction Tenant is to provide Landlord with a copy of an agreement between Tenant and a bonded disbursement company, a performance bond or other method which will guarantee the payment of construction funds and final line-free completion of any and all work performed by the Tenant within the leased premises. Method of guarantee shall be approved by Landlord. All fees for this service to be paid by Tenant.

**F.** Tenant shall arrange and pay for construction and installation of signs in accordance with the Sign Criteria identified as Exhibit "D" and attached hereto.

**G.** Tenant is not to install any equipment on the roof unless written permission is received from Landlord prior to installation. Roof mounted equipment shall be behind equipment screens (where applicable). Roof equipment location and weight shall be given to Landlord to assure adequacy of roof design prior to installation.

**H.** Tenant shall install a governmentally approved grease interceptor on the sanitary sewer line.

**I.** Tenant shall not cause any roof penetration to occur, either in connection with the installation of equipment as referenced in Paragraph G of this Exhibit "C", or otherwise, without written consent first obtained from Landlord. Landlord shall not unreasonably withhold approval to a roof penetration reasonably required provided such consent may be given without loss of roof warranty protection available to Landlord under initial construction contract for the installation of such roof. It is recommended that Tenant, in the event any such roof penetration is contemplated, consult with and retain as contractor for the performance of such work, subject to final approval by Landlord, that roofing contractor retained by General Contractor for the installation of such initial roof and obtain in writing from such roofing contractor and the General Contractor a statement that such roof penetration shall not constitute a limitation upon that warranty furnished with respect to the initial installation of said roof. Contact for such review may be made by contacting General Contractor, _Gage & Davis Construction Co._



**EXHIBIT "C"**
**Page 2 of 2**

## SIGN CRITERIA

### I. GENERAL REQUIREMENTS

A. Tenant shall submit before fabrication four (4) copies of the proposed signage to the Landlord for approval. One (1) copy shall be colored. These drawings must include location, size and style of sign, and lettering. Also include installation details and color selection.

B. All permits for signs and their installation shall be the responsibility of the Tenant. Any fees involved shall be paid for by the Tenant.

C. The sign contractor shall be responsible for the fulfillment of all governing code requirements and adhering to the sign program established herein.

C. Signs shall be constructed of top grade cedar.

### II. CONSTRUCTION REQUIREMENTS

A. Each sign contractor is required to see to it that the proper permits have been obtained from the local governing agencies prior to fabrication.

B. Each sign contractor must seal off and touch up all mounting holes and leave the premises free of debris after installation. The general contractor is authorized to correct all such work at the expense of the sign contractor.

C. Tenant shall be responsible for the operations of their sign contractors.

### I. RESTRICTIONS

A. Logos or manufacturers' decals, hours of business, telephone numbers, etc., are limited to a total of 144 square inches per single door entrance. All sale signs, special announcements, etc., are not permitted on exterior or interior glass. Such advertising must be set back at least 12 inches from the storefront surface.

B. Advertising devices such as A-boards, posters, banners or flags are not permitted.

C. Painted, flashing, animated, audible, revolving or other signs that create the illusion of animation are not permitted.

D. Exposed bulb signs are not permitted.

E. No exposed junction boxes, lamps, tubing, conduits, raceways or neon crossovers of any type are permitted.

F. No wall graphics are permitted.

G. All signage shall conform to the local governing agencies' sign regulations.

Note: A tenant leasing two (2) or more spaces shall be allowed a sign which is a maximum of the combined total length of the signs allowed for those spaces.

EXHIBIT "D"

Page 1

# EXHIBIT B

## EXTENSION OF LEASE

On April 13, 1985, DUBLIN TOWN & COUNTRY ASSOCIATES ("Landlord") and CARLTON L. PERRY AND DWIGHT W. PERRY ("Tenant") entered into a lease for certain property known as 7272 San Ramon Road, Dublin, California.

The parties wish to extend the term of said lease and modify the rental provisions thereof and in order to do so agree as follows:

1)   The term of the above referenced lease shall be extended through June 30, 2004;

2)   Effective (retroactively) July 1, 1994, the minimum monthly rent is agreed to be $2,257.50. (Common area charges are in addition to this amount);

3)   The minimum monthly rent will be adjusted pursuant to the cost of living adjustment provision set forth in the referenced lease on July 1, 1995, and each July 1 thereafter during the lease term.

4)   The referenced premises are now known as 7242 San Ramon Road, Dublin, California;

5)   Tenant may install, subject to the approval of the City of Dublin, one or two washing machines, together with a cooling tower to conserve water usage. Tenant will reimburse Landlord for any additional water usage which results from the installation of such equipment.

Executed at Danville, California, the _8_ day of _August_, 1994.

_____
CARLTON L. PERRY

DUBLIN TOWN & COUNTRY ASSOCIATES
By: _____

_____
DWIGHT W. PERRY

# EXHIBIT C

## ASSIGNMENT

FOR VALUABLE CONSIDERATION the receipt and sufficiency of which is hereby acknowledged, the undersigned CARLTON L. PERRY and DWIGHT W. PERRY (hereinafter referred to as "Assignors") do hereby grant, convey and assign to KWANG SUK LEE and KUI JA LEE (hereinafter referred to as "Assignees"), all of said Assignors' right, title and interest in and to that certain Lease dated April 13, 1985, made by DUBLIN TOWN & COUNTRY ASSOCIATES, a partnership, as Lessor and the undersigned as Lessee for the premises generally known and described as CROW CANYON CLEANERS consisting of approximately 1,806 square feet located at 7242 San Ramon Road, Dublin, California, said Lease extending for a term ending June 30, 2004. Assignors hereby request and solicit the consent of Lessor to the forgoing assignment, and as a material inducement to Lessor to give such consent agree that: (i) By virtue of the foregoing assignment, Assignees' acceptance thereof, or Lessor's consent thereto, Assignors are not released from liability or responsibility under and pursuant to the aforementioned Lease; (ii) Lessor is not concerned with the character, credit, or financial condition of Assignees, and agree to bear and assume the entire risk from such character, credit, and financial condition and to keep themselves informed at all times of the condition, status and performance of Assignees under the Lease and of the character, credit and financial condition of Assignees; and (iii) Lessor may from time to time, without notice or demand, without obtaining Assignors' approval and without affecting Assignees' liability under said Lease amend, modify, or alter the provisions of said Lease or renew, compromise, extend, accelerate, or otherwise change the duties, responsibilities, and liabilities of the parties under said Lease, provided, however, that no such action by Lessor shall be deemed to nor shall it increase or expand the liability of Assignors thereunder.

Dated: _____8/8_____, 1994

ASSIGNORS

_Carlto L. Perry_
CARLTON L. PERRY

_[signature]_
DWIGHT W. PERRY

## ACCEPTANCE OF ASSIGNMENT AND ASSUMPTION

The undersigned, KWANG SUK LEE AND KUI JA LEE, (hereinafter referred to as "Assignees"), do hereby each individually and collectively accept the assignment of the aforesaid Lease dated April 13, 1985 made by DUBLIN TOWN & COUNTRY ASSOCIATES, a Partnership, as Lessor, and CARLTON L. PERRY and DWIGHT W. PERRY, as Lessee, for the premises generally known and described as CROW CANYON CLEANERS, consisting of approximately 1,806 square feet located at 7242 San Ramon Road, Dublin, California. The undersigned Assignees do hereby individually and collectively expressly assume and agree to keep, perform, and fulfill all the terms, covenants, conditions, and obligations required to be kept, performed, and fulfilled by Assignors as Lessee thereunder, including the prompt making of all payments due to or payable on behalf of Lessor under said Lease when due and payable.

Assignees further agree to save Assignors free and harmless from any liability arising under or pursuant to said Lease after the date of this Assignment. As used herein, the singular includes the plural and the plural the singular, and the liability of Assignees shall be joint and several. Assignees shall pay to Assignors the sum of $3,400.00 to reimburse Assignors for the lease deposit held by Lessor under the aforesaid Lease.

Dated: __8-8_____, 1994

ASSIGNEES:

_Kwang Suk Lee_____
KWANG SUK LEE

_____
KUI JA LEE

## CONSENT TO ASSIGNMENT

The undersigned DUBLIN TOWN AND COUNTRY ASSOCIATES, a Partnership (hereinafter referred to as "Lessor"), Lessor in the Lease described in the foregoing assignment, hereby consents, upon the conditions hereinafter set forth, to the assignment of the aforesaid Lease to KWANG SUK LEE and KUI JA LEE (hereinafter referred to as "Assignees"), waiving none of Lessor's rights under said Lease as to or against CARLTON L. PERRY and DWIGHT W PERRY (hereinafter referred to as "Lessee") or Assignees without releasing or relieving Lessee from any duties, responsibilities, or liabilities under said Lease by reason of said assignment, and with the specific understanding that this consent is not a consent to any future assignment of said Lease.

Dated: _August 8)_____, 1994.

LESSOR:

DUBLIN TOWN & COUNTRY
   ASSOCIATES, a Partnership

By: _W. Lihaha_____
Its _Partner_____

# EXHIBIT D

Crow Canyon Clean

# EXTENSION OF LEASE

On April 13, 1985, DUBLIN TOWN & COUNTRY ASSOCIATES, ("Landlord") and Carlton L. Perry and Dwight W. Perry ("Tenant") entered into a lease for certain property known as 7272 San Ramon Road, Dublin, California.

On August 8, 1994, said lease was assigned from "Tenant" to Kwang Suk Lee and Kui Ja Lee ("Tenant II") with Landlord's consent without relieving "Tenant" of liability under said lease.

"Tenant II" and "Landlord" wish to extend the term of said lease on the following terms and conditions:

1)  The term of the above referenced lease shall be extended through June 30, 2014;

2)  The minimum monthly rent will be adjusted pursuant to the cost of living adjustment provision set forth in the referenced lease on July 1, 2004 and each July 1 thereafter during the lease term.

3)  The referenced premises are now known as 7242 San Ramon Road, Dubin, California.

Executed at Danville, California, the 6th day of December, 1999.

_____
Kwang Suk Lee

_____
Kui Ja Lee

Dublin Town & Country Associates

By: _____
William F. Kartozian

# EXHIBIT E

# ASSIGNMENT

FOR VALUABLE CONSIDERATION the receipt and sufficiency of which is hereby acknowledged, the undersigned KWANG SUK LEE and KUI JA LEE (hereinafter referred to as "Assignors") do hereby grant, convey and assign to NAM SUN PARK and SEUNG HEE PARK (hereinafter referred to as "Assignees"), all of said Assignors' right, title and interest in and to that certain Lease dated April 13, 1985, made by DUBLIN TOWN & COUNTRY ASSOCIATES, a partnership, as Lessor and the undersigned as Lessee for the premises generally known and described as CROW CANYON CLEANERS consisting of approximately 1,806 square feet located at 7242 San Ramon Road, Dublin, California, said Lease extending for a term ending June 30, 2004. Assignors hereby request and solicit the consent of Lessor to the forgoing assignment, and as a material inducement to Lessor to give such consent agree that: (i) By virtue of the foregoing assignment, Assignees' acceptance thereof, or Lessor's consent thereto, Assignors are not released from liability or responsibility under and pursuant to the aforementioned Lease; (ii) Lessor is not concerned with the character, credit, or financial condition of Assignees, and agree to bear and assume the entire risk from such character, credit, and financial condition and to keep themselves informed at all times of the condition, status and performance of Assignees under the Lease and of the character, credit and financial condition of Assignees; and (iii) Lessor may from time to time, without notice or demand, without obtaining Assignors' approval and without affecting Assignors' liability under said Lease amend, modify, or alter the provisions of said Lease or renew, compromise, extend, accelerate, or otherwise change the duties, responsibilities, and liabilities of the parties under said Lease, provided, however, that no such action by Lessor shall be deemed to nor shall it increase or expand the liability of Assignors thereunder.

Dated: _____12/6/99_____, 1999

ASSIGNORS:

_____
KWANG SUK LEE

_____
KUI JA LEE

# ACCEPTANCE OF ASSIGNMENT AND ASSUMPTION

The undersigned, NAM SUN PARK and SEUNG HEE PARK, (hereinafter referred to as "Assignees"), do hereby each individually and collectively accept the assignment of the aforesaid Lease dated April 13, 1985 made by DUBLIN TOWN & COUNTRY ASSOCIATES, a Partnership, as Lessor, and KWANG SUK LEE and KUI JA LEE, as Lessee, for the premises generally known and described as CROW CANYON CLEANERS, consisting of approximately 1,806 square feet located at 7242 San Ramon Road, Dublin, California. The undersigned Assignees do hereby individually and collectively expressly assume and agree to keep, perform, and fulfill all the terms, covenants, conditions, and obligations required to be kept, performed, and fulfilled by Assignors as Lessee thereunder, including the prompt making of all payments due to or payable on behalf of Lessor under said Lease when due and payable.

Assignees further agree to save Assignors free and harmless from any liability arising under or pursuant to said Lease after the date of this Assignment. As used herein, the singular includes the plural and the plural the singular, and the liability of Assignees shall be joint and several. Assignees shall pay to Assignors the sum of $3,400.00 to reimburse Assignors for the lease deposit held by Lessor under the aforesaid Lease.

Dated : _/2/ 7_____, 1999

ASSIGNEES:

_____
NAM SUN PARK

_____
SEUNG HEE PARK

## CONSENT TO ASSIGNMENT

The undersigned DUBLIN TOWN AND COUNTRY ASSOCIATES, a Partnership (hereinafter referred to as "Lessor"), Lessor in the Lease described in the foregoing assignment, hereby consents, upon the conditions hereinafter set forth, to the assignment of the aforesaid Lease to NAM SUN PARK and SEUNG HEE PARK (hereinafter referred to as "Assignees"), waiving none of Lessor's rights under said Lease as to or against KWANG SUK LEE and KUI JA LEE (hereinafter referred to as "Lessee") or Assignees without releasing or relieving Lessee from any duties, responsibilities, or liabilities under said Lease by reason of said assignment, and with the specific understanding that this consent is not a consent to any future assignment of said Lease.

Dated : __/2/7_____, 1999

LESSOR:

DUBLIN TOWN & COUNTRY ASSOCIATES,  a Partnership

By: _____

Its ____PARTNER_____

# EXHIBIT F



WENDEL
ROSEN
BLACK
@DEAN
——— LLP ———
ATTORNEYS AT LAW

OAKLAND | MODESTO

GREGGORY C. BRANDT

510-834-6600 (phone)
510-588-4935 (fax)

gbrandt@wendel.com
www.wendel.com

April 14, 2008

Jan A. Greben
Greben & Associates
1332 Anacapa Street, Suite 110
Santa Barbara, CA 93101

**Re:    Tender for Defense and Indemnity to Nam Sun Park and Seung Hee Park
pursuant to April 3, 1985 Shopping Center Lease Agreement and all
relevant addendum and amendments thereto**

Dear Mr. Greben:

We have been retained to represent William Kartozian, who was a partner in Dublin
Town & Country Associates, the former owner of the Lamps Plus Plaza. As you know, Mr.
Kartozian has been named in the lawsuit captioned *Bruce A. Burrows, et al. v. Dwight W. Perry,
et al.*, United States District Court, Northern District of California Case No. C 07 5354 MHP.
That lawsuit is based upon alleged contamination at the Lamps Plus Plaza. This letter is Mr.
Kartozian's tender to your clients for defense and indemnity pursuant to the terms of the April 3,
1985 Shopping Center Lease Agreement and subsequent addendum, amendments and
assignments thereto ("Lease").

Paragraph 20(D) of the Lease states, in pertinent part, that Nam Sun Park and Seung Hee
Park "covenant[] and agreed that neither Landlord or its agents, servants or employees, shall at
any time or to any extent whatsoever be liable, responsible or in anywise accountable for any
loss, injury, death or damage to person(s) or property which at any time may be suffered or
sustained by Tenant or by any person(s)…whether or not such loss, injury, death or damage shall
be caused by or in any manner result from or arise out of any act, omission or negligence of
Tenant…and Tenant shall and herewith does forever indemnify, defend, hold and save Landlord,
it agents, servants and employees free and harmless of, from and against any and all claims,
liability, loss, costs, expense or damage whatsoever, including, but not by way of limitation,
attorneys' fees, on account of any loss, injury, death, or damage occurring on, in, or about the
Leased Premises, or arising from the use or occupancy of the Lease Premises, or in violation of
any law, rule, ordinance, or regulation thereon."

Paragraph 32(A) also states that the Landlord shall not be liable "for any injury or
damage to…property resulting from …leaks from any part of the Lease Premises or from the

Jan A. Greben
April 14, 2008
Page 2

WENDEL, ROSEN, BLACK & DEAN LLP

pipes, appliances or plumbing works or from the ...subsurface or from any other place...or by any other cause of whatsoever nature."

Paragraph 32(B) of the Lease states that all covenants and agreements in the Lease also inure to the benefit of the landlord and each of its personal representatives. Mr. Kartozian was a partner in Dublin Town & Country Associates and, therefore, has the legal right to assert and enforce all protections set forth in the Lease. Based upon these provisions in the Lease, your clients have an obligation to defend and indemnify Mr. Kartozian.

I understand that my partner, Donald Simon, recently contacted you to indicate that we would be filing a motion to set aside the default that you entered on your cross-compliant against our client. I plan to file the application to set aside the default by the end of the week. If you have any questions, or would like to discuss this matter further, please call me.

Very truly yours,

WENDEL, ROSEN, BLACK & DEAN LLP

Greggory C. Brandt

cc:    William F. Kartozian
       Donald S. Simon

000010.0001\844993.1



OAKLAND | MODESTO

GREGGORY C. BRANDT

510-834-6600 (phone)
510-588-4935 (fax)

gbrandt@wendel.com
www.wendel.com

April 15, 2008

Jan A. Greben
Greben & Associates
1332 Anacapa Street, Suite 110
Santa Barbara, CA 93101

**Re:**   **Tender for Defense and Indemnity to Nam Sun Park and Seung Hee Park pursuant to April 3, 1985 Shopping Center Lease Agreement and all relevant addendum and amendments thereto**

Dear Mr. Greben:

This letter is to clarify that my April 14, 2008 letter was a tender on behalf of both William Kartozian and Dublin Town & Country Associates. This letter, along with my April 14, 2008 letter, are tenders by both William Kartozian and Dublin Town & Country Associates to your clients for defense and indemnity pursuant to the terms of the April 3, 1985 Shopping Center Lease Agreement and subsequent addendum and amendments thereto ("Lease").

Very truly yours,

WENDEL, ROSEN, BLACK & DEAN LLP

Greggory C. Brandt

cc:   William F. Kartozian
      Donald S. Simon

000010.0001\845151.1